# Agreed-Upon Redacted Copy—May Be Made Public

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(BID PROTEST)

| | |
|---|---|
| DYNCORP INTERNATIONAL, LLC,<br><br>*Plaintiff.*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant*,<br><br>and<br><br>M1 SUPPORT SERVICES LP<br><br>*Defendant-Intervenor.* | No. 07-84<br>Judge Bush |

**BRIEF IN SUPPORT OF DEFENDANT-INTERVENOR'S RULE 52.1(b) CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Respectfully submitted,
/s/ Philip J. Davis

Philip J. Davis

(Counsel of Record)

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel: 202.719.7044
Fax: 202.719.7049

*Counsel for*
M1 SUPPORT SERVICES LP

OF COUNSEL:
William A. Roberts, III
Richard B. O'Keeffe, Jr.
Jon W. Burd
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006

Dated: February 26, 2007

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 5

A. The Solicitation ..... 5

B. The Source Selection Evaluation Team's Evaluation of Proposals ..... 7

1. The Technical Evaluations ..... 8

2. The Past Performance Evaluations ..... 12

3. The Price Evaluations ..... 13

4. Evaluation Team Consensus Recommendations ..... 14

C. The Source Selection Decision ..... 15

D. The Source Selection Decision Document ..... 17

III. DISCUSSION ..... 18

A. Standard of Review ..... 18

B. The Air Force's Award to M1 Is Based on Rational Decisions That Are Thoroughly Supported by the Administrative Record ..... 19

C. [redacted] Because the Air Force Awarded the Contract Without Discussions and, Therefore, Was Not Required To, and Did Not, Establish a Competitive Range ..... 23

D. The Air Force Reasonably [redacted] in Accordance With the Stated RFP Criteria ..... 27

E. The Air Force Did Not Conduct Discussions With M1 ..... 33

F. The Air Force's Transition/Phase-In and Past Performance Evaluations Were Reasonable and In Accord With the RFP's Stated Evaluation Criteria ..... 39

1. The Transition/Phase-In Plan Evaluations Were Reasonable ..... 40

2. The Past Performance Evaluations Were Reasonable ..... 42

G. M1's Proposal Complied With All Material Terms of the Solicitation and Was Eligible for Award ..... 46

IV. CONCLUSION ..... 47



Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

# TABLE OF AUTHORITIES

## Cases

*Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173 (2005)....................43

*Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377 (2003), *aff'd* 365 F.3d 1345 (Fed. Cir. 2004)....................40

*Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 319 (2000)....................19-20

*Clean Serv. Co.*, B-281,141.3, Feb. 16, 1999, 99-1 CPD ¶ 36....................27

*Delphinus Eng'g, Inc.*, B-296,902, B-296,902.2, Sept. 20, 2005, 2005 CPD ¶ 7....................41

*Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004)....................24, 34, 37

*Info Tech. & Apps. Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003)....................24, 34

*Jackson Enters.*, B-286,688, Feb. 5, 2001, 2001 CPD ¶ 25....................39

*JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650 (2002)....................26

*Microcosm, Inc.*, B-277,326, Sept. 30, 1997, 97-2 CPD ¶ 133....................9

*North Carolina Div. of Servs. for Blind v. United States*, 53 Fed. Cl. 147 (2002)....................32

*Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413 (2006)....................26

*SDS Petroleum Prods., Inc.*, B-280,430, Sept. 1, 1998, 98-2 CPD ¶ 59....................27

*Structural Preservation Sys., Inc.*, B-285,085, July 14, 2000, 2000 CPD ¶ 131....................9

## Statutes

5 U.S.C. § 706(2)(A)....................18

28 U.S.C. § 1491(b)(4)....................18

## Regulations

FAR § 9.105-1(b)(3)....................38, 39

FAR § 15.306(c)(1)....................24, 25, 34

FAR Subpart 19.13....................14



Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

## I.
## PRELIMINARY STATEMENT

The Administrative Record in this case establishes the reasonableness and correctness of the United States Air Force's ("Air Force") award of the Consolidated Aircraft Maintenance ("CAM") Contract to M1 Support Services LP ("M1"), a woman-owned, service-disabled, veteran-owned, HUBZone small business concern. Even DynCorp International LLC ("DI") recognizes the compelling nature of the record, for it fails to present any argument whatsoever regarding two of the five counts in its Complaint, thus presumably abandoning those protest grounds. For the remaining counts, DI is reduced to fashioning contentions that depend critically on ignoring substantial record evidence and applicable case law which wholly undercut its position and render its protest decidedly unmeritorious.

The Air Force award to M1 over DI [redacted]" To the contrary, M1's proposal was rated [redacted] on [redacted]—on which M1 scored the *maximum* Blue/Exceptional and [redacted]

Moreover, M1 was evaluated across all the evaluation factors and subfactors as having [redacted], and M1 was deemed to have not a single deficiency or weakness in its proposal, [redacted]. DI effectively concedes the rationale of the Air Force's assessment of the merits of M1's proposal, for it mounts not a single challenge to any evaluated strength found in M1's proposal. Thus, even assuming *arguendo* that the Air Force somehow erred, which it did not, in [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

Besides this "score card" type summary [redacted], the record evidences a compelling narrative from the Air Force Source Selection Evaluation Team ("SSET") demonstrating the technical merit of M1's proposal. The SSET concluded [redacted]

DI bemoans the Air Force decision not to hold discussions [redacted]

Yet, as shown below, the Solicitation explicitly cautioned offerors, in numerous places, that the Air Force "intends to award *without discussions*" and "intends to make an award based on *initial proposals*." Offerors were thus instructed to submit their best technical and price proposals from the start. This warning—that the Air Force "intends to evaluate proposals and award a contract without discussions with offerors"—was expressly confirmed by the Air Force later in the competition in response to a question posed by one of the offerors on this very issue. DI's complaint about the absence of discussions thus flies in the face of the "rules of the game" established by the Government and made known to all competitors.

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order

[redacted]

Consistent with the Solicitation and standard practice, the Air Force invited offerors to submit questions regarding the Solicitation and the Record shows that offerors, including DI, took advantage of this opportunity, including seeking clarification of other Solicitation provisions and asking for additional information. If DI, notwithstanding its incumbency, [redacted] Case law precludes a protestor from complaining about Solicitation defects *after* proposal submission. It is simply too late now—two months after award—for DI to claim for the first time that it did not understand [redacted]

DI's complaint that [redacted] The Record does not show that [redacted]. To the contrary, the Record makes clear that [redacted], reviewing

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

the extensive evaluation documents, undertaking the required trade-off analysis and concluding [redacted]

Nor, contrary to DI's assertion, did the Air Force improperly conduct discussions with M1 by virtue of the few "Evaluation Notices" ("ENs") sent to M1. These ENs were mere "clarifications"—on their face, under the Federal Acquisition Regulation ("FAR"), and under applicable case law. The ENs simply requested M1 to provide non-material clarifications concerning its proposal. They did not, as DI charges, give M1 the opportunity to revise its proposal. Again, DI can cite to no record evidence that M1's EN responses revised (or were intended to revise) a single page of MI's proposal or that the Air Force deemed the responses to constitute such revisions. The Air Force did not even transmit the ENs to M1 until *after* both the Initial Evaluation Briefing ("Briefing") by the SSET to the SSA and the preparation of the Proposal Analysis Report ("PAR"), and M1's responses are nowhere reflected in any revision or addendum to those evaluation documents or the subsequent SSDD. All the Air Force did with M1's responses to the ENs was to note that they were [redacted] The ENs were thus nothing more than requests for clarifications, and M1's responses merely provided clarifications.

Finally, M1's proposal is not ineligible for award due to any alleged failure to comply with a term of the Solicitation by not providing [redacted], as DI contends. The Solicitation specifically stated that such documentation was only requested as [redacted], and that not all offerors had to submit [redacted], it likewise required no [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

For the foregoing reasons, more fully stated below, M1 respectfully requests that the Court deny DI's Motion for Judgment on the Administrative Record and grant M1's Cross-Motion for Judgment on the Administrative Record.

## II.
## FACTUAL BACKGROUND

### A. The Solicitation

The Air Force issued Request for Proposals No. FA4890-06-R-0165 ("RFP" or "Solicitation") on July 3, 2006. AR Tab 4. The RFP's Performance Work Statement ("PWS") described the services that would be required under the CAM program, to provide intermediate and organizational maintenance of Air Combat Command Companion Trainer Program T-38 aircraft. *See* AR 188-215.

Proposals were evaluated under four criteria: (i) Mission Capability, (ii) Proposed Risk, (iii) Past Performance and (iv) Price/Cost. AR 173-79. Mission Capability was more important than Proposal Risk; Mission Capability and Past Performance were equal in importance. Those three factors were more important than Price/Cost.

Under the Mission Capability factor, each offeror was instructed to "set forth in the most comprehensive manner its understanding of the program requirements and to demonstrate its ability to meet the evaluation requirements of [the Mission Capability factor]." *Id.* Each proposal was to contain "a clear and concise description of how [the offeror] plans to meet contract requirements." *Id.* This factor was subdivided into three technical evaluation subfactors. Two of those three subfactors, Program Management and Operations and Maintenance, were of equal weight. Both were more important than the third subfactor, Transition/Phase-In. The Operations and Maintenance subfactor was further segregated into four distinct technical evaluation "aspects." Evaluations under two of these aspects, one dealing with aircraft

inspection turnaround time and the other with maintenance information data integrity, have been put at issue in this Protest by DI.

The Evaluation Factors section of the Solicitation informed offerors that their technical proposals would be evaluated based on their ability to demonstrate compliance with the stated evaluation criteria. [redacted]

[redacted]

AR 175.

The Solicitation instructed offerors to "include all of the information requested in the specific instructions" and noted that "[a] proposal that merely reiterates or promises to accomplish the requirements of the PWS will be considered unacceptable." AR 154. Under the [redacted], offerors were directed to provide "specific, detailed, and complete" responses that would "clearly and fully demonstrate that the offeror has a thorough understanding of the requirements for the accomplishment of the effort." AR 155. To further emphasize the Air Force's desire for detailed responses, the Solicitation

---

[1] All emphasis is added throughout this Brief, unless noted otherwise.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

warned that "[s]tatements that the offeror understands, can, or will comply with the PWS; statements paraphrasing the PWS or parts thereof; and phrases such as 'standard procedures will be employed' or 'well known techniques will be used' etc., will be considered unacceptable." *Id.* (parentheticals omitted). In other words, the Solicitation demanded on-point responses from offerors that affirmatively demonstrated an understanding of the Solicitation's requirements.

Moreover, in recognition that the Air Force hoped to use this procurement to prompt an enhancement of the current CAM program, offerors were instructed to "[i]dentify any innovations or efficiencies that would result in cost reductions, cost avoidance, or qualitative improvements" that would benefit the Air Force. *Id.*

Finally, the Solicitation repeatedly alerted offerors that the Government intended to make an award without discussions. *See* AR 155 ("[T]he Government intends to award *without discussions*."), 173 ("As set forth in Section L . . . of the solicitation, the Government intends to award *without discussions*."), 174 (noting that "[t]he Government intends to make an award *based on initial proposals*" and that negotiations would only take place if "it is determined to be in the best interest of the Government"). The Air Force thus explicitly notified offerors that it would likely award the contract based solely on the initial proposals that offerors submitted. This was confirmed by the Air Force in a written response to an offerors's question on that precise point, in which the agency reiterated that "the offeror's *initial proposal should contain the offeror's best terms* from a cost or price *and technical standpoint*" because "the Government intends to evaluate proposals and award a contract without discussions with offerors." AR 615.

### B. <u>The Source Selection Evaluation Team's Evaluation of Proposals</u>

Two proposals were received in response to the Solicitation, from DI and M1. The proposals were reviewed by members of the SSET, which then presented the results of their

evaluations to the Source Selection Advisory Council ("SSAC") and SSA in a 32-page Briefing on October 4, 2006. *See* AR Tab 14.[2]

1. **The Technical Evaluations**

Initially, the TET members independently reviewed the strengths, deficiencies, uncertainties and weaknesses of each proposal based on the evaluation criteria in the Solicitation. *See* AR 712. "Strengths" and "weaknesses" were defined as follows:

> Strength—*Significant, outstanding or exceptional aspect of an offeror's proposal* that has merit and exceeds specified performance or capability requirements in a way that is advantageous to the Government, and either will be included in the contract or is inherent in the offeror's process.
>
> . . . .
>
> Weakness—A flaw in the proposal that increases the risk of unsuccessful contract performance. A "significant weakness" in the proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

AR 737. A "deficiency" was defined as "[a] material failure of a proposal to meet a Government requirement." AR 736.

After the initial evaluations by the individual members, the TET met as a body to review and discuss each evaluator's assessment, and a "consensus was reached on whether or not to include" or adopt an individual evaluator's comments in the overall evaluation. *Id.* The TET also reached consensus regarding the overall ranking and risk rating for each proposal under each evaluation subfactor. *Id.* The ultimate TET recommendations, therefore, were all consensus conclusions based on input and discussion—and ultimate unanimous agreement—by all of the TET members.[3] The TET reached a consensus evaluation that M1's proposal [redacted]

---

[2] The SSET was divided into a technical evaluation team ("TET"), past performance team and price team. AR 709.

[3] DI has relied on individual evaluator notes as somehow undermining the assessment [redacted] *See, e.g.*, Pl. Br. at 25-26. Although the Court during a February 14 conference call ordered the

[redacted] In fact, and as summarized in the Table on the following page, the TET determined that M1's proposal [redacted]. *See* Table at p. 10, *infra* ([redacted]

As for the Program Management subfactor, specifically, [redacted] AR 719, 725-27. Notwithstanding these adjectival ratings, M1's proposal [redacted] the TET evaluated with respect to this subfactor that would [redacted] AR 726-27. By contrast, the TET identified [redacted] for this subfactor. AR 719. Based on M1's [redacted], the TET noted that it had determined that [redacted] AR 777.

Under the Operations and Maintenance subfactor, M1's proposal was evaluated to have [redacted] AR 728-29. Each of the [redacted]

---

individual evaluator notes to be added to the Record, the Court invited the parties to argue the relevancy of such materials in their briefs.

The individual evaluator notes are not relevant to the analysis at hand. Even though the individual TET members prepared notes to inform their discussion during the TET discussion process, the fact remains that after discussions the TET came to *consensus* opinions on every evaluation criteria. The consensus evaluations *supersede* any of the individual evaluator notes, and extinguish whatever relevance those notes could have to the Court's present review. Thus, it matters not [redacted] because the TET did not report its findings or recommendations to the SSA *on an individual basis*, but instead reached and reported only the results *of its unanimous consensus findings*. Therefore, the only relevant decisions that the SSA considered from the TET were those *consensus findings*. *See, e.g., Microcosm, Inc.*, B-277,326, 97-2 CPD ¶ 133 ("[T]he consensus reports and source selection decision were consistent with the [agency's solicitation announcement]; since the evaluators' notes and scoring sheets are not necessary to judge the rationality of the evaluation that is otherwise adequately documented, an examination of individual scoresheets would be irrelevant here."); *Structural Preservation Sys., Inc.*, B-285,085, 2000 CPD ¶ 131 ("The record includes the consensus scores of the evaluation board, which incorporated comments by individual evaluators, and a detailed and reasonable evaluation and comparison of the two highest-rated proposals. This record clearly documents the differences perceived among proposals and their strengths, weaknesses and risks. Accordingly, the evaluators' notes and scoring sheets are not necessary to judge the rationality of the evaluations.).")

**Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.**

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted] *Id.* The TET did not determine M1's technical proposal to have [redacted]. Accordingly, M1 received a Blue/Low Risk evaluation for this subfactor.

DI's technical proposal, [redacted] evaluation. The TET identified [redacted] in DI's proposal, but it also determined that DI [redacted] AR 720-21. Specifically, the TET concluded that DI's proposal [redacted] *Id.* This [redacted]

DI's proposal [redacted] *Id.* Although the Solicitation required offerors to provide [redacted] The TET therefore [redacted] *Id.* at 721.

Finally, under the Transition/Phase-In subfactor, [redacted] AR

721-22, 729-30. [redacted]

The TET deemed [redacted] M1's proposal had [redacted]

AR 734. DI's proposal, on the other hand, [redacted]

AR 153.

2. **<u>The Past Performance Evaluations</u>**

A Performance Confidence Assessment Group ("PCAG") evaluated past performance and assessed each offeror's past performance in the aggregate, and assigned a "Performance Confidence Assessment" rating to each. *See* AR 177. The PCAG members independently determined the relevance of each offeror's past performance and assigned a past performance rating. *See* AR 714. The PCAG then reached consensus ratings for each offeror. *Id.* In each past performance evaluation, the PCAG determined how relevant the offeror's performance experience was to the CAM Contract based on how closely the work and the scope of the offeror's prior contracts related to the CAM Contract. AR 176-78.

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted], the PCAG reviewed past performance information [redacted] *See* AR 730. MI's past performance evaluations were all [redacted] and the scope and the price of most of its prior experience was deemed to be [redacted] to the CAM Contract. AR 731. [redacted] *Id.* Although the PCAG noted that [redacted]

DI's evaluated past performance was deemed to be either [redacted] AR 723. Its performance was generally scored as [redacted] AR 723. Accordingly, [redacted]

3. **<u>The Price Evaluations</u>**

The Solicitation indicated that award would be made based on a "best value" determination in which price would be considered as one of several evaluation criteria, albeit the least significant. *See* AR 174. The Air Force explicitly noted that "[t]his may result in an award being made to an offeror with a higher-rated, higher-priced proposal when . . . the Source Selection Authority determines that the technical superiority, overall business approach, and/or superior past performance of the offeror with the higher-priced proposal outweighs the price difference." AR 173.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

M1's total evaluated price was $41,827,924. AR 733. DI's proposed price was [redacted] *Id.* Because M1 is a qualified HUBZone small business concern, it was entitled to a mandatory price preference in the evaluation of its price proposal.[4] Since DI is not a HUBZone company, the Air Force was required to adjust DI's price proposal upward by 10%, resulting in a total *evaluated* price of [redacted] AR 733. [redacted] AR 733.

4. **Evaluation Team Consensus Recommendations**

Based on the SSET's consensus technical, past performance, and price evaluations, it recommended to the SSA that award be made to M1 without discussions. *See* AR 734-35. The SSET's recommendation was based on the [redacted] associated with MI's proposal, its

---

[4] The HUBZone Program is administered by the Small Business Administration under the Small Business Reauthorization Act of 1997. The Program stimulates economic development and creates jobs in historically underutilized business zones, including urban and rural communities, by providing Federal contracting preferences to qualifying small businesses. A qualifying HUBZone business must maintain a principal office location within a qualifying HUBZone, and at least 35% of its employees must reside in a HUBZone. *See generally* FAR Subpart 19.13.

The HUBZone program is implemented in FAR Subpart 19.13. In acquisitions conducted using full and open competition where price is among the evaluation criteria and the total contract price exceeds the simplified acquisition threshold ($100,000), as here, the contracting officer is *required* to give proposals from HUBZone small business concerns a "price evaluation preference by adding a factor of 10 percent to all [non-HUBZone or other small business] offers." FAR § 19.1307(b). Thus, in evaluating the proposed prices of any non-HUBZone offeror, the contracting officer is required to assume that the evaluated price proposal of the non-HUBZone offeror (like DI, here) is 10% higher than the price reflected in its proposal. The HUBZone offeror preserves this price proposal preference even if it is part of a joint venture or has a major subcontractor, so long as the HUBZone offeror retains a 51% majority stake in the venture.

**Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.**

[redacted] in M1's ability to perform the contract, and [redacted] in M1's proposal. AR 734.

## C. The Source Selection Decision

The SSA tentatively accepted the recommendations the SSET presented in its Briefing. Accordingly, the SSET then further expanded upon and detailed its proposed evaluations and comparative analysis in a 43-page, single-spaced Proposal Analysis Report. *See* AR Tab 15. The PAR concluded that award would be made "to the offeror who gives the Air Force the greatest confidence that it will best meet the requirements affordably." AR 745. It noted that [redacted] but stated that a best value trade-off analysis confirmed that [redacted] *Id.* The SSET's PAR confirmed the recommendation in its Briefing that award be made without discussion, meaning that "neither offeror will be allowed to revise its proposal" and, therefore, that a competitive range would "not be established." AR 745-46.

The PAR went into an in-depth comparison of M1's and DI's proposals, consistent with the Briefing. For example, under the Program Management subfactor of Mission Capability, the SSET noted that [redacted] AR 777.

Under the Operations and Maintenance subfactor, the PAR noted that DI's [redacted] AR 778-79. Even without [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted] for the Operations and Maintenance subfactor, [redacted] *See* AR 761 [redacted] By contrast, [redacted] *See* AR 770-71. Under the Air Force's evaluation scheme,

[redacted]

AR 753. Therefore, [redacted]

Notwithstanding DI's [redacted] however, the PAR [redacted] the PAR recommended award to M1 without discussions, [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

The PAR recommended that the Air Force issue ENs to M1, the apparently successful offeror, to allow it "to clarify certain aspects of the proposal or to resolve minor or clerical errors." *See* AR 783. M1's responses to the ENs would not "affect the proposal evaluation results." *Id.* The next day, the Air Force issued six ENs to M1. *See* AR 785-791; AR Tab 13.

**D. <u>The Source Selection Decision Document</u>**

The SSA ultimately arrived at his official Source Selection Decision to award to M1 based on his (i) "integrated assessment of the proposals," (ii) "independent assessment of the proposals against all source selection criteria in the solicitation," and (iii) the "proposed terms and conditions of the contract." AR 792. After an "extensive review of the source selection and documentation," such as the Briefing and the PAR, and "consultation with the [SSET]," at the Briefing, the SSA determined that M1 offered the "greatest overall benefit in satisfying the Air Force's stated requirements" based on M1's proposal [redacted] being low risk, and having a rating of Significant Confidence." AR 792. The SSA's rationale is included in an 18-page, single-spaced SSDD. *See* AR Tab 16.

In the SSDD, the SSA reviewed the evaluation process, the proposal evaluations, including the strengths of each proposal and, [redacted] on a factor-by-factor and subfactor-by-subfactor basis. Based on this extensive analysis, the SSA concluded that award to M1 would provide "the best overall benefit to the government." AR 807.

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

*Id.* Relying on his integrated assessment of all evaluation criteria, the SSA concluded that "M1S presents the best overall value to the government based on its strong ratings for the Mission Capability sub-factors." *Id.* The SSA expressly mentioned each of M1's [redacted] *Id.*

Overall, the SSA concluded that award should be made to M1 based on each of the following rationales:

- M1S' Receipt of Blue/Exceptional ratings for the following Mission Capability Sub-factors, Program Management, and Operations and Maintenance
- M1S' Receipt of a Green/Acceptable Rating for the following Mission Capability Sub-factor, Transition/Phase-In
- M1S' Receipt of a Low Proposal Risk Rating for each Mission Capability sub-factor
- M1S' Receipt of a Significant Confidence Rating for the Performance Confidence Assessment
- The Determination that M1S' Prices are Fair and Reasonable
- [redacted]

AR 808. Accordingly, award was made to M1 on December 21, 2006. AR 867.

## III. DISCUSSION

### A. Standard of Review

In a bid protest, this Court reviews an agency's procurement decisions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). In this inquiry, the Court focuses on whether the procurement decision is supported by a rational or reasonable basis or if there is a

"clear and prejudicial violation of applicable statutes and regulations." *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 319 (2000) (quotations omitted).

To this end, "[i]t is well-established that when determining whether a government agency acted with a rational or reasonable basis in making a procurement decision, including its evaluation of bids and application of procurement regulations, *courts afford agencies wide discretion*." *Id.* at 320 (citations omitted). "This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a 'best value' procurement." *Id.* Both of those factors—a best value, negotiated procurement—are present here.

Furthermore, when the procurement decisions involve "technical matters that are within the agency's expertise," this Court exercises the highest degree of deference. *Id.* Accordingly, even if "reasonable minds could reach differing conclusions," this Court will "not substitute its judgment for that of the agency as long as the agency's decision is grounded in reason." *Id.*

**B. <u>The Air Force's Award to M1 Is Based on Rational Decisions That Are Thoroughly Supported by the Administrative Record.</u>**

The Record proves that the SSA award to M1 was reasonable and correct. In those instances where the SSA was required to make decisions that affected the outcome of the procurement, those decisions were rational, supported by the Record, and consistent with statute and regulation, and within the agency's well-reasoned discretion.

The initial evaluation phase, in which the SSET evaluated each offeror's proposal based on each of the evaluation factors, resulted in an award recommendation that is in complete harmony with the record. First, the TET extensively reviewed each of the technical proposals and ultimately identified M1's proposal [redacted]. Although DI's Complaint and Brief harp on the agency's purported failure [redacted]

[redacted] in its proposal, simply focusing on the relative *strengths* of each proposal justifies the rationale of the Air Force's award to M1.

According to the Solicitation's evaluation scheme, the Mission Capability factor was one of the two (equally) most important evaluation criteria. Within that factor, Program Management and Operations and Maintenance were the two *most important* subfactors. AR 174. In these two most important subfactors, M1 distinguished itself as superior based on the [redacted] that it proposed. [redacted] *See* p. 10, *supra* (Table). In other words, [redacted], M1's technical proposal [redacted] For a procurement in which the Government was clearly seeking to improve on the *status quo* that its incumbent—DI—provided, [redacted], the award decision was justified.

But the TET confronted more than just [redacted] It also determined [redacted] AR 157, 175. [redacted]

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

AR 800.

[redacted] *See* pp. 9-12, *supra*.

[redacted]

Within the realm of its technical expertise, [redacted] AR 175, 762. [redacted]

AR 157.

Indeed, [redacted] AR 1904-08. [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted] *See, e.g.*, AR 1905 [redacted] In other words, [redacted] AR 1908. [redacted] AR 764, 773. [redacted] AR 807.

The SSA was therefore presented with a scenario in which M1's technical proposal [redacted] *See* AR 777 [redacted] 807 [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted] AR 783 (SSET's PAR).

Therefore, relying on his discretion, the SSA elected to award the contract to M1 without discussions. This decision, as reflected in the SSDD, [redacted] AR 807.

In sum, the rationale for award to M1 is amply documented and thoroughly supported by the Record.

C. [redacted] **Because the Air Force Awarded the Contract Without Discussions and, Therefore, Was Not Required To, and Did Not, Establish a Competitive Range.**

DI alleges in Count I that [redacted] Compl. at 10-11. That allegation, however, is wholly refuted by the Record, which unquestionably shows that the Air Force notified potential offerors an award would likely be made without discussions and did not establish a competitive