range. Under the FAR and case law, that is sufficient and under the facts, the Air Force properly exercised its discretion.

The Air Force decision not to engage in discussions or establish a competitive range is entirely consistent with FAR § 15.306(a)(3) ("*Award may be made without discussions* if the solicitation states that the Government intends to evaluate proposals and make award without discussions."). If an award is to be made without discussions, as was the case here, then the procuring agency has no basis for forming a competitive range. *See* FAR § 15.306(c)(1) ("Agencies shall evaluate all proposals in accordance with 15.305(a), and, *if discussions are to be conducted, establish the competitive range.*").

Consistent with the FAR, the Federal Circuit has specifically endorsed such a procurement procedure, so long as the solicitation notifies offerors of the Government intent to award without discussions. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) (affirming Court of Federal Claims' decision that the agency was permitted by FAR § 15.306 to forego discussions, so long as the solicitation stated that intent); *see also Info. Tech. & Apps. Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003).

Here, there is no question that the Solicitation repeatedly notified offerors that the Air Force would likely make award without discussions. *See* AR 155 ("[T]he Government intends to award without discussions."), 173 ("As set forth in Section L . . . of the solicitation, the Government intends to award without discussions."), 174 (noting that "[t]he Government intends to make an award *based on initial proposals*" and that negotiations would only take place instead if "it is determined to be in the best interest of the Government"). Moreover, in response to a specific question whether the contract would be awarded with or without discussions, following a site visit by prospective offerors, the Air Force repeated its intent: "*The Government intends to*

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

*evaluate proposals and award a contract without discussions with offerors*." AR 615. The Air Force thus instructed that "the offeror's initial proposal should contain the offeror's best terms from a cost or price *and technical standpoint*." *Id.* The Solicitation was unambiguous with respect to the Air Force's intent to award the Contract based solely on the initial proposals, without conducting discussions.

DI was on notice, then, that its initial proposal would likely be the sole basis for the Air Force's source selection evaluation, and that its proposal would therefore be required to [redacted] The Solicitation specifically noted that "Offerors are required to meet all solicitation requirements, including its terms and conditions, representations and certifications, *and technical requirements in addition to those identified as factors, subfactors, or aspects to be eligible for award*." AR 173. [redacted] AR 175. [redacted]

Since the Air Force intended to award the Contract without discussions, it never formed a competitive range for this procurement; nor was it required to do so given its stated intent in the Solicitation to award without discussions. *See* FAR § 15.306(a), (c); AR 745-46 ("The determination [to award without discussions] means that *a competitive range*...will not be established."). Based on the strength of M1's proposal, the SSET's initial source selection

recommendation was to "Award to M1 Support Services Without Discussions." AR 734. The SSET posited, as *a non-recommended alternative*, that the Air Force *could*, instead, form a competitive range and conduct discussions with both offerors—the approach that DI now argues the Air Force was required to take. [redacted] *See* AR 783 (noting the [redacted] *See* AR 735, 783.

The Air Force's approach here is entirely consistent with other procurements that this Court has refused to upset based on a protester's assertion that the agency *should* have conducted discussions because they might have resulted in the protester gaining award. For example, in *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413 (2006), the Court noted the "general rule" that there "is no obligation that a contracting agency conduct discussions where the RFP specifically instructs offerors of the agency's intent to award a contract on the basis of initial proposals." *Rig Masters*, 70 Fed. Cl. at 421-22 (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 663 (2002)). [redacted] *Id.* at 420-21; *see also JWK Int'l Corp.*, 52 Fed. Cl. at 661-63.

In light of the procurement scheme announced in the Solicitation here, and the Air Force's conclusion that M1 presented a superior proposal, the Air Force acted within its discretion in awarding the contract without discussions. As a consequence of awarding the contract without discussions, the Air Force was not required to, and did not, establish a competitive range.[5] Therefore, there is no factual or legal basis for DI's protest ground that it was excluded from a competitive range and that the Air Force should have conducted discussions with it.

**D. The Air Force Reasonably Evaluated [redacted]**

In Count II, [redacted]

[5] The cases DI cites in its Complaint (¶ 34) to suggest that a competitive range of one is improper or inconsistent with procurement policy have been rendered irrelevant by a change in the FAR. Of course, the Court does not need to reach this issue because no competitive range was established. In any event, DI's cases are inapposite because they pre-date a major revision of FAR Part 15 in 1997, which changed the regulations on competitive range. The GAO has ruled that the revised FAR does not preclude a competitive rate of one:

> The earlier language, FAR § 15.609(a) (June 1997), stated that the competitive range "shall include all proposals that have *a reasonable chance* of being selected for award" and that "[w]hen there is doubt as to whether a proposal is in the competitive range, the proposal should be included." The current language, which governs this procurement, states, "Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section." FAR § 15.306(c)(1). We do not read the revised language to require agencies to retain in the competitive range a proposal that the agency reasonably concludes has no realistic prospect of award, even if that proposal is, as here, the second-highest rated proposal. . . . Accordingly, we conclude that the Part 15 rewrite does not require that agencies retain in the competitive range a proposal that is determined to have no responsible prospect of award simply to avoid a competitive range of one. *We have long held that there is nothing inherently improper in a competitive range of one.*

*SDS Petroleum Prods., Inc.*, B-280430, Sept. 1, 1998, 98-2 CPD ¶ 59; *see also Clean Serv. Co.*, B-281141.3, Feb. 16, 1999, 99-1 CPD ¶ 36.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

As noted above, the RFP clearly put offerors on notice that [redacted] The RFP was almost excruciatingly explicit, not only in repeatedly warning offerors to put their best effort into initial proposals, [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

The RFP was thus clear in its message that offerors must follow instructions regarding evaluation criteria. [redacted]

[redacted] Pl. Br. at 23, 24. [redacted]

[redacted] Pl. Br. At 24. [redacted]

Notwithstanding this concession, [redacted]

In light of the foregoing, the Air Force was amply justified in reaching the unanimous consensus that:

---

[6] In its Motion, DI makes much of the assertion that it "would voluntarily follow the requirements of Air force Instruction" (AFI 21-101). Pl. Br. 17. All that AFI 21-101, ¶ 6.3.6.20.8 says is that the Data Integrity Team is responsible for "educating the unit on the critical need for data integrity." This comment does not supply the missing information in DI's proposal describing a data integrity training process.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

AR 762. [redacted]

[redacted]

*Id.* These evaluations indicate not only that [redacted]

Moreover, the AR reveals that competitors had the opportunity to submit, and did submit, questions to the contracting officer concerning aspects of the RFP that were deemed unclear, and that each question was answered. *See generally* AR Tab 9. The Record shows that offerors submitted questions seeking clarification of RFP provisions and asking for additional information. *See AR* at 611, 616, 618. [redacted]

More importantly, [redacted] Pl. Br. 26-28. First, if true, the argument ignores the fact that, [redacted]

Second, the argument, and the precedent cited in support of it, are wholly inapposite to a source selection decision made in the year 2007. [redacted] Pl. Br. at 26. [redacted] More importantly, however, it employs precedent based on outdated FAR provisions. In 1984, as explained in footnote 5 above, the rule with respect to inclusion in the competitive range was, in essence, "when in doubt, include." Since the re-write of FAR Part 15 in 1997, the rule shifted 180 degrees to, "when in doubt, leave

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

'em out." The revised FAR Part 15 no longer requires a procuring agency to include an offeror in a competitive range merely because there is a "reasonable chance" of award to that offeror.

Finally, [redacted]

For the foregoing reasons, this Count has no factual or legal basis and should be denied.

**E. <u>The Air Force Did Not Conduct Discussions With M1.</u>**

Count V of Plaintiff's Complaint is based on the erroneous assumption that the Air Force conducted discussions with M1 prior to award. The Complaint alleges that the SSDD "disclosed that the Air Force had discussions with M1 regarding 'the application of the proposed handling rate percentages.'" Compl. ¶ 27. In turn, Count V complains that the Air Force improperly conducted "discussions" with M1 but failed to "extend[] a similar opportunity to all other

---

[redacted] Pl. Br. 29. This single bullet, among hundreds of pages of evaluation documents, is obviously not a complete statement of the rationale for not conducting discussions with DI. This rationale is not cited in any of the other evaluation documents (the Briefing, the PAR or the SSDD) as a basis for not engaging in discussions. Indeed, the predominant reason for not establishing a competitive range is set forth in the SSDD, [redacted]

Redacted Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

offerors within the competitive range." Compl. ¶ 56. Notwithstanding the salient fact that the Air Force never established a competitive range, the Record demonstrates that the Air Force did not conduct discussions with M1 at any point during the procurement. Instead, the Administrative Record clearly reveals that the Air Force only requested and received "clarifications" from M1.

"Discussions" and "clarifications" are terms of art within Government contracts that have distinct meanings that the Federal Circuit has identified based on the applicable FAR provisions:

> [I]n the context of a government contract proposal, the term "discussions" has a specific legal definition: "discussions involve negotiations" and "*are undertaken with the intent of allowing the offeror to revise its proposal*."... In contrast to discussions, "clarifications" are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated."

*Galen Med.*, 369 F.3d at 1332-33 (citations omitted). "If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors." *Id.* (quoting FAR § 15.306(a)(2)). The primary distinction between "discussions" and "clarifications" involves whether the procuring agency is affording the offeror an opportunity to *revise its proposal*: "[U]nlike clarifications, discussions 'are undertaken with the intent of allowing the offeror to revise its proposal.'" *Info. Tech.*, 316 F.3d at 1321 (quoting FAR § 15.306(d)).

Here, by their terms, each EN was a mere clarification. Each EN sent to M1 was marked by the Air Force as being "FAR 15.305(a) Clarifications" and *not* "FAR 15.306(c) Discussions." AR 785-791. There is no indication at all in the Record that the Air Force intended the ENs to permit M1 to revise or in any way alter the substantive terms of its proposal. *See* AR 745 ("The SSA accepted the recommendation *to award without discussions* which means that *neither offeror will be allowed to revise its proposal*."). Nor is there any record evidence that M1's EN

responses revised or were intended to revise any page of M1's proposal. Likewise, there is no hint that the Air Force considered the responses to modify M1's proposal.

To the contrary, the Air Force's review of M1's EN responses consisted of nothing more than the comment that [redacted] AR 655-75. The Air Force prepared no addendum or revision to its Briefing to the SSET and SSA or to the associated PAR based on M1's EN responses, confirming that the responses had no impact on the agency's evaluation and did not bear on it. Nor was any information in M1's responses noted or otherwise relied upon in the SSDD, further confirming that none of M1's EN responses resulted in "revisions" to its proposal. *See* AR Tab 16. Instead, the SSDD is entirely consistent in every substantive respect with the earlier PAR that was prepared on October 30, 2006, *the day before the ENs were even sent to M1*. *See* AR Tab 15; AR 653 (October 31, 2006 Email from Jacquelyn Cooper to M1 with attached ENs).

Nevertheless, DI points to five ENs that it holds out as affording M1 "the opportunity to make significant proposal revisions." Pl. Br. 31. For each of the reasons discussed below, however, the record and the law are clear that none of those ENs resulted in any revision to M1's proposal or otherwise constituted "discussions."

*EN MC-2, AR 657-59:* Under the Management and Integration aspect of the Program Management subfactor, offerors were required to demonstrate an "organizational structure and staffing process(es) and procedure(s) necessary to ensure all needed personnel resources are provided for the successful accomplishment of PWS requirements." AR 155-56. [redacted]

[redacted] In essence, the Air Force was curious as to information that M1 provided *which had not been required or identified in the Solicitation and was not among any of the evaluation criteria*. Nowhere in the source selection documents does the Air Force appear to have relied on M1's response to this EN.

<u>*EN MC-3*, AR 660-61:</u> Under the aspect for "Approach to Improve Aircraft Phase Inspection Turnaround Time," M1 proposed and justified a process by which phase turnaround time could be [redacted] AR 1384. As required by the Solicitation, M1 identified the information that supported this proposed turnaround improvement. AR 1384-85. The proposal [redacted] EN MC-3 was issued simply to clarify [redacted] AR 660. DI erroneously claims that this EN asked M1 [redacted] This *is a clear misinterpretation of what the EN actually requested*. Instead, the EN explicitly asked [redacted] AR 660. The Air Force thus

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

was simply interested in determining what, [redacted] M1 clarified that [redacted] Nothing in the EN or M1's response requested or provided the opportunity for M1 to revise its proposal, and M1's response did nothing more than clarify its proposal, entirely consistent with the role of a "clarification."

<u>*EN MC-P1*, AR 662-63, 677-696:</u> This EN merely required M1 to perform a simple arithmetic application of the proposed handling rates *that it had already included in its proposal* to the Not-to-Exceed amounts included in the Solicitation. AR 662. Throughout M1's price proposals, it had identified the "Handling Rate" that would be applied to cost-reimbursable contract line item numbers (CLINs). For each such CLIN, the Solicitation identified a Not-to-Exceed ("NTE") amount. In its proposal, M1 identified what its handling rate (expressed as a percentage) would be applied for each cost-reimbursable CLIN. For example, under CLIN 0116, M1 indicated that it's handling rate would be [redacted] AR 1448.

The EN simply required M1 to extend its stated handling rate to the identified NTE amount, by multiplying the given NTE by the handling rate. For CLIN 0116, therefore, M1 simply multiplied [redacted] by the NTE of $38,000, to "fill in the blank" with a net extended amount of [redacted] *See* AR 677. Correcting such a minor mathematical issue is the quintessentially proper use of a "clarification." *See Galen Med. Assocs.*, 369 F.3d at 1333 (noting that correction of an obvious mathematical error "would fall squarely within the definition of 'clarification' rather than 'discussion'"). M1's responses to this did not result in a revision to its proposal, because *all of the relevant information* was already present in the original proposal. M1 merely multiplied figures that had already been provided. Contrary to

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

DI's implication, there was no "*modification* of rates" anywhere in M1's EN response. Pl. Br. 32. M1's handling rates remained the same.

*EN P-2*, AR 663-64 and *EN P-3*, AR 665, 707-08: These two ENs requested information from M1 that was not among the Solicitation's Section M evaluation criteria, *see* AR 173-79, but was instead relevant only to the Air Force's post-source selection "responsibility" determination. *See* FAR Subpart 9.1. Responsibility determinations are typically performed only *after* the agency has already evaluated proposals and selected an intended awardee to confirm that the awardee has the resources to perform the contract and are evidenced by the agency's signing of the contract. *See* FAR 9.105-2(a) ("The contracting officer's signing of the contract constitutes a determination that the prospective contractor is responsible with respect to that contract."). The factors considered as part of the responsibility determination are not material or substantive evaluation criteria that in any way impact or affect the source selection process. The procurement scheme in this case was consistent with such an approach, as none of the information requested in ENs P-2 and P-3 was identified among the Solicitation's evaluation criteria in Section M. AR 173-79.

EN P-2 requested that M1 clarify whether [redacted] AR 663. In its proposal, M1 had stated that, [redacted] AR 1749. The Solicitation also asked offerors to supply [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted] Nothing in M1's EN response revised its proposal or contributed in any way to the source selection evaluation that the Air Force conducted.

EN P-3 requested [redacted] The FAR instructs that financial and other information relevant to the responsibility determination "shall be obtained or updated on as current a basis as is feasible *up to the date of award*." FAR § 9.105-1(b)(3). Therefore, the agency's request for this non-evaluative information did not provide M1 with an opportunity to "revise" its proposal, but merely afforded the agency an opportunity to gather the most current [redacted] possible to include in its post-source selection responsibility determination. It is of no consequence that [redacted] because such data was not material to the source selection evaluation, and M1's subsequent submission of this information was not a "revision" of its proposal. *See Jackson Enters.*, B-286,688, Feb. 5, 2001, 2001 CPD ¶ 25 (offeror's failure to acknowledge a solicitation amendment, although required by the solicitation, was not a material omission because such acknowledgement "is not material where it does not impose any legal obligations on the bidder different from those imposed by the original," and a bidder's failure to comply with a solicitation requirement "that is not material is waivable as a minor informality").

**F. The Air Force's Transition/Phase-In and Past Performance Evaluations Were Reasonable and In Accord With the RFP's Stated Evaluation Criteria.**

In Counts III and IV of the Complaint, DI alleges that the Air Force unreasonably evaluated M1's Transition/Phase-In ("TPI") plan and its Past Performance to be [redacted] respectively for these evaluation criteria. In its Motion, DI does not address either of these counts and has thus presumably abandoned both of these protest grounds. However, in

the event these protest issues are deemed still to be in the case, M1 addresses them here and shows their lack of merit.

DI's allegations in Counts III and IV arise to nothing more than mere disagreement with the Air Force's evaluations. Protest case law is clear that such disagreements fail to make out a protest ground. *See, e.g., Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377 (2003), *aff'd* 365 F.3d 1345 (Fed. Cir. 2004). By their nature, source selection decisions, although based on certain objective criteria, are subjective, and the RFP here recognized that. See RFP, ¶ M-1.2, AR 173 ("While this Government evaluation team and the SSA will strive for maximum objectively, the course some selection process by its nature is subjective.")

Recognizing this reality, this Court has rejected protest grounds that are founded on mere subjective disagreements with the evaluation. In *Banknote*, the Court confronted a protester who argued hat its technical proposal should have been rated higher, and that of the awardee's rated lower. The Court resoundingly concluded that disagreements founded on "[s]uch naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious." *Banknote*, 56 Fed. Cl. at 384. However, a naked claim is all that DI has advanced in Counts III and IV.

**1. <u>The Transition/Phase-In Plan Evaluations Were Reasonable.</u>**

The essence of Count III is premised on DI's "information and belief" that M1 "has never been a prime contractor on a contract of such 'magnitude and complexity'" as the CAM Contract, and that the Air Force was therefore irrational in assigning the [redacted] Compl. ¶¶ 46-47. The RFP, however, stipulated that the TPI subfactor would be evaluated based on the *soundness of the plans*

*submitted by offerors*, rather than on the *experience of the offerors*, themselves. Specifically, TPI plans were to be evaluated on the basis of the:

> Soundness of the offeror's management processes to provide continuity of mission support and contract performance to include efficiently phasing in resources and trained/qualified personnel required to assume contract tasks and responsibilities at the start of the contract performance period.

AR 176; *see also* AR 157.

In other words, contractor experience was not among the RFP's stated evaluation criteria for this subfactor, and the Air Force could not therefore consider "experience" in its TPI evaluation. *See, e.g.*, *Delphinus Eng'g, Inc.*, B-296,902, B-296,902.2, Sept. 20, 2005, 2005 CPD ¶ 7 ("The Competition in Contracting Act of 1984, as implemented by the Federal Acquisition Regulation, requires that solicitations include a statement of evaluation factors and . . . requires that agencies evaluate and select proposals for award based solely on the terms of the solicitation.").

DI does not focus on the soundness of M1's TPI plan but, instead, addresses M1's experience, alone, based solely on its "information and belief." However, even if DI's information and belief concerning M1's experience were accurate, which it is not,[8] the RFP's evaluation criterion for TPI plans did not in any way require—or permit—the Air Force to evaluate an offeror's experience in conjunction with the TPI evaluation. Therefore, on its face, Count IV fails to state grounds upon which relief may be granted, and should be dismissed under RCFC 12(b)(6).

On the merits, Count III must be rejected because it is clear that the Air Force correctly and reasonably applied the RFP evaluation criteria. The PAR made it clear that the SSET

---

[8] As discussed, *infra*, with respect to Count IV, [redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

employed the correct sections and criteria of the RFP in evaluating both TPI plans, *viz.*, RFP Secs. L-8.1.1.2.3.1 and M-4.4.2.1. AR 763, 772.

Both the DI (AR 1913-19) and M1 (AR 1391-98) TPI plans addressed each required element and was of comparable length. [redacted] *See* AR 763, 77. The SSET therefore reached a consensus that:

> [redacted]
>
> . . . .
>
> [redacted]

AR 779 *accord*, AR 802-04 (SSDD).

In view of Count III's erroneous focus on M1's purported lack of experience rather than its proposed TPI plan and the absence of any apposite critique of the Air Force's evaluation of this sub-factor based on the Record, DI has failed to carry its heavy burden to prove that the Air Force acted arbitrarily or irrationally in evaluating the TPI plans. Count III should thus be dismissed or denied.

**2. <u>The Past Performance Evaluations Were Reasonable.</u>**

In Count IV, DI appears to suffer from a fatal case of "incumbent fever," a characterization of the seeming entitlement sometimes evidenced by incumbent contractors that simply cannot believe that any competitor could be deemed to possess [redacted] past performance in a "follow-on" procurement. The thrust of Count IV is that DI has the most

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

relevant past performance reference (*i.e.*, the incumbent CAM contract), and has performed well on that contract, while M1, "on information and belief … has not been a prime contractor on any contracts of the same 'magnitude and complexity of the [current] effort.'" Compl. ¶ 52. Thus, according to DI, the only rational past performance evaluation would be for the Air Force to give DI [redacted] *Id.*

DI's assertion should be rejected for it amounts to nothing more than mere disagreement with the agency's judgment, and is thus an insufficient basis to sustain a protest. *See Avtel Services, Inc. v. United States*, 70 Fed. Cl. 173, 218 (2005) (protester argued that if *it* had rated the awardee it would have assigned the awardee a neutral past performance rating; Court ruled that "a protester's mere disagreement with the agency's evaluation determination does not provide a basis for sustaining the protest").

The Record documents show that the Air Force fully complied with the stated requirements of the RFP. The RFP specified that Past Performance would be evaluated using a "Performance Confidence Assessment" ("PCA") which "represents an evaluation of an offeror's present and past work record so that the Government can make a determination about its confidence in the offeror's probability of successfully performing as proposed." RFP, ¶ M-6.1, AR 176. Offerors' PCAs were to be evaluated first by determining the "relevance" of the offerors' past performance records *vis-à-vis* the CAM Contract requirements. *See* AR 177. The RFP informed offerors that more relevant contracts would receive a higher relevance score:

> Higher relevancy will be assessed for contracts that are most similar to the effort, or portion of the effort, for which the contractor is submitting a proposal and may contribute to an overall higher relevancy score for the offeror. The Government is not bound by the offeror's opinion of relevancy.

RFP ¶ M-6.1, AR 176.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

While the relevance of offerors' past performance was part of the Past Performance evaluation process here, the RFP made it clear that Past Performance ratings would focus primarily on performance:

> Although the past performance evaluation focuses on performance that is relevant to the Mission Capability subfactors and the Price factor, the resulting Performance Confidence Assessment is made at the Past Performance factor level and represents an overall evaluation of contractor performance.

RFP, ¶ M-6.2, AR 177-8.

The Record demonstrates that the Air Force followed the RFP criteria for evaluating past performance. [redacted] The PCAG evaluated the contracts submitted by each offeror, considering information related to relevance and performance as required by the RFP. *See* AR 772-5 (for M1) and AR 763-5 (for DI). Each contract was evaluated for relevance and performance with respect to each of three Mission Capability sub-factors. [redacted] AR 773. [redacted] The overall past performance evaluation for M1 was [redacted] based on [redacted] resulting in an overall past performance assessment of [redacted] AR 775.

[redacted]

[redacted] AR 765.

The PCAG report disclosed that, overall, [redacted] The PCAG further identified [redacted] AR 764, 774. In the end, [redacted]

DI's "information and belief" challenge is unfounded. Regardless of whether M1 had ever performed as a "prime contractor" on a relevant contract, the PCAG properly applied the criteria set forth in the RFP and made a well-documented and reasonable determination, which was ultimately endorsed by the SSET and the SSA, that the offerors [redacted][9] DI's uninformed disagreement notwithstanding, there is no basis to sustain the protest ground boldly alleged in Count IV.

---

[9] DI alleged that "M1 … has not been a prime contractor on any contracts of the same 'magnitude and complexity'" as the CAM contract. Compl. ¶ 52. The issue of whether M1 has performed as a prime contractor or as a subcontractor is not relevant to this procurement. The RFP clearly stated that "[t]he offeror's present and past work record includes work in joint venture, subcontracting, and/or teaming partners arrangements." RFP, ¶ L-9.2, AR 158. Moreover, DI has not identified, nor could it identify, any solicitation provision that required the Air Force to consider *only* contracts of "the same magnitude and complexity" as the CAM contract.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

## G. M1's Proposal Complied With All Material Terms of the Solicitation and Was Eligible for Award.

In a futile final salvo against the Source Selection Decision, DI alleges that M1 is not eligible for award because it [redacted] Pl. Br. at 33-34. This protest ground is likewise not sufficient to overturn the award.

The crux of this protest issue is a truncated and erroneous quotation from the RFP. DI would have the Court believe that M1 was required, unconditionally, to [redacted] Pl. Br. at 33. However, that excerpt omits language which established the *conditional* nature of this requirement. The pertinent provision states:

[redacted]

AR 161. This language shows that the Air Force explicitly contemplated that, for some offerors, [redacted] The RFP thus tied the requirement to submit [redacted] directly to the existence [redacted]

Also, as M1 explained to the Air Force, M1, as a prime contractor [redacted] AR 697. Nonetheless, it informed the Air Force in its proposal,

[redacted]

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

[redacted]

AR 1749.

DI is wrong in asserting that the award to M1 must be set aside for this reason. Nowhere in Section M or elsewhere in RFP does the Air Force state that [redacted] will be evaluated against each other. Nor does the RFP mandate that an offeror [redacted] would be excluded from the competition or otherwise deemed ineligible for award. Nor could it in light of the Solicitation provision quoted above evidencing the conditional [redacted] nature of the [redacted] Any such draconian approach would have automatically [redacted] from the CAM competition. Rather, the RFP left any evaluation consequences of the [redacted] to the discretion of the Air Force. *See* RFP, ¶ L-6.1, AR 154 ("Failure to include all of the information requested *may* adversely affect the evaluation and *may* result in a determination that the proposal is non-responsive.").

The Air Force, in its discretion, found M1's explanation of its situation *vis-à-vis* a [redacted] to be "acceptable" and decided that this issue did not impact its award decision. AR 664.

## IV.
## CONCLUSION

For the foregoing reasons, M1 respectfully requests that the Court deny DI's Motion for Judgment on the Administrative Record and grant M1's Cross-Motion for Judgment on the Administrative Record.

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.

Respectfully submitted,

/s/ Philip J. Davis
Philip J. Davis
(Counsel of Record)

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel: 202.719.7044
Fax: 202.719.7049

*Counsel for*
M1 SUPPORT SERVICES LP

OF COUNSEL:
William A. Roberts, III
Richard B. O'Keeffe, Jr.
Jon W. Burd
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006

Dated: February 26, 2007

Protected Material To Be Disclosed Only In Accordance with U.S. Court of Federal Claims Protective Order.