**PUBLIC REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(BID PROTEST)

| | |
|---|---|
| DYNCORP INTERNATIONAL LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant,*<br><br>and<br><br>M1 SUPPORT SERVICES LP,<br><br>*Defendant-Intervenor.* | No. 07-84<br>Judge Bush |

**REPLY BRIEF IN SUPPORT OF DEFENDANT-INTERVENOR'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Philip J. Davis
(Counsel of Record)

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel: 202.719.7044
Fax: 202.719.7049

*Counsel for*
M1 SUPPORT SERVICES LP

Of Counsel:
William A. Roberts, III
Richard B. O'Keeffe, Jr.
Jon W. Burd
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006

Dated: March 6, 2007

[redacted]

## TABLE OF CONTENTS

**Page**

I. **INTRODUCTION** .......... 1

II. **RESPONSES TO THE COURT'S FEBRUARY 27 ORDER** .......... 2

A. **The Most Relevant Precedent Related to the Distinction Between Clarifications and Discussions Following the 1997 Part 15 Re-write.** .......... 3

B. **The Impact of the FAR Part 15 Rewrite on the Precedent of Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970 (Fed. Cir. 1993).** .......... 4

C. **The Absence of Any Legal Duty of the Contracting Officer to Conduct Clarifications or Discussions with Either Offeror If the Agency Intends to Award Without Discussions.** .......... 9

D. **The DCMA-Approved Purchasing System Was Merely a Factor for Consideration in the Agency's Responsibility Determination and Was Not a Material Requirement** .......... 11

III. **THE ENS WERE MERELY "CLARIFICATIONS" ON THEIR FACE, IN FORM, AND IN SUBSTANCE** .......... 15

IV. **CONCLUSION** .......... 20

## I. <u>Introduction</u>

In this procurement, the Air Force sought new efficiencies, innovations, and cost savings for the Consolidated Aircraft Maintenance ("CAM") Contract. The Air Force emphasized that the evaluation would place a premium on innovative approaches that exceeded Solicitation requirements, and that such evaluated "strengths" might be incorporated into the Contract as added value. Ultimately, the Air Force determined that the proposal of M1 Support Services LP ("M1") offered "the greatest overall benefit in satisfying the Air Force's stated requirements," presented the Air Force with the greatest number of strengths, "contained no deficiencies/uncertainties," was "low risk" and gave the Air Force "significant confidence." M1's proposal presented the "best value" to the Air Force because its "technical superiority and overall business approach … outweigh[ed] the relatively small price difference" with DynCorp International LLC ("DI").

In view of the qualitative technical gap between the proposals, which DI does not challenge, DI is reduced to making factual allegations that are contradicted by the Administrative Record and positing legal obligations on the Air Force that cannot withstand scrutiny. These arguments do not overcome the reasonableness and correctness of the award to M1, a woman-owned, service-disabled, veteran-owned, HUBZone small business concern.

With briefing at a close, the Record and the applicable law drive the following facts and legal conclusions, which collectively nullify DI's protest:

(i) The Air Force did not establish a competitive range, either real or "de facto," in this procurement.

(ii) DI's proposal was never eliminated from the competition but, rather, was considered through the ultimate award decision by the Source Selection Authority ("SSA"), as reflected in the Source Selection Decision Document ("SSDD").

(iii) The Air Force, in the Solicitation and other documents, repeatedly notified offerors that it "intends to evaluate proposals and make award without discussions" and "intends to make award based on initial proposals" and that offerors, therefore, should put forth their best terms and conditions in their initial proposals.

(iv) The Air Force had no legal obligation to conduct discussions with DI to give it the opportunity to address [redacted].

[redacted] The Air Force reasonably determined that discussions with DI on this deficiency would have been futile due to the "low probability" that DI's ranking would have exceeded M1's ranking after such discussions [redacted]

(vi) The Evaluation Notices ("ENs") that the Air Force sent to M1 were designated and intended as clarifications and were clarifications in their substance.

(vii) M1's responses to the ENs provided the requested clarifications and nothing more, were acknowledged as "acceptable" by the Air Force, and did not result in any revisions to M1's proposal.

(viii) The Air Force also had no legal obligation to request clarifications from any offeror or to seek clarifications from DI once it asked for clarifications from M1.

(ix) The Solicitation provision addressing "documentation of a Defense Contract Management Agency (DCMA)-approved purchasing system" is a factor in the agency's responsibility determination, not a material requirement or a responsiveness issue.

The Administrative Record and pertinent legal authority thus compel the granting of the Government's and M1's Cross-Motions and denial of DI's Motion.

## II. <u>Responses to the Court's February 27 Order</u>

In its February 27, 2007 Order, the Court requested that the parties address four issues. Each of these issues are specifically addressed below.



[redacted]

**A. The Most Relevant Precedent Related to the Distinction Between Clarifications and Discussions Following the 1997 Part 15 Re-write.**

For several reasons, the most helpful, relevant decision on this issue is the Federal Circuit's opinion in *Information Technology & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003). First, it specifically addressed the 1997 FAR Part 15 Re-write and the implications of the revised FAR provisions on the distinction between "clarifications" and "discussions." *Info Tech.*, 316 F.3d at 1320-21. Second, it articulated the Federal Circuit's view on the relevant distinction between the two, focusing on whether or not the agency has afforded the offeror an opportunity *to revise its proposal* through the exchanges. *Id.* at 1321.

Third, the decision confronted a factually-analogous scenario to the one here, in which the agency issued ENs that were marked as "FAR 15.306(a) clarifications" and which the agency intended as clarifications. Notwithstanding the protester's challenge that the exchanges were really "discussions" masked as clarifications—the same argument DI raises here—the Circuit concluded that the agency's interpretation of whether the exchanges were clarifications (just as they had been marked on their face) was entitled to deference. *Id.* At 1323. ("It was a reasonable interpretation of the acquisition regulations to view the ENs as clarifications, and *we defer to that interpretation*" because "'the [acquisition] regulations entrust the contracting officer with *especially great discretion, extending even to his applications of procurement regulations*.'") (quoting *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002)).[1]

---

[1] The Federal Circuit's instruction that the Court should defer to the agency's determination of the nature of the EN exchanges contradicts Plaintiff's argument at pages 18-20 of its Response Brief (hereinafter "DI Resp.").

All emphasis is added throughout this Reply Brief, unless otherwise noted.



[redacted]

Finally, the Circuit rejected the protester's argument—again, similar to one DI has raised here with respect to ENs MC-2, MC-3, and P-2—"that the ENs could not be clarifications because they 'requested additional information'" on the common-sense ground that "*[a]ny meaningful clarification would require the provision of information.*" *Id.* at 1323. Any more restrictive interpretation of a clarification, according to the Circuit, would be "cramped." *Id.* Accordingly, an exchange between the Government and an offeror does not become a "discussion" merely because additional information is requested or provided. The focus, instead, is on *whether the exchange revises the proposal.*[2]

## B. The Impact of the FAR Part 15 Rewrite on the Precedent of *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970 (Fed. Cir. 1993).

A competitive range is formed only when the contracting officer intends to conduct discussions with offerors for the purpose of affording them the opportunity to revise their proposals. When, as here, the agency announces its intention to award *without* discussions and subsequently does award the contract *without* conducting any discussions, a competitive range is *not* formed. FAR 15.306(c)(1) ("[I]f discussions are to be conducted, [the agency shall] establish the competitive range."); *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 420-22 (2006) ("There generally is no obligation that a contracting agency conduct discussions where the RFP specifically instructs offerors of the agency's intent to award a contract on the basis of initial

---

[2] Subsequent decisions of the Court of Federal Claims have relied upon the rationale employed in *Information Technology*. *See, e.g.*, *SecureNet Co. v. United States*, 72 Fed. Cl. 800, 814-15 (2006) (noting that post-proposal request for information related to audit, but not technical evaluations, constituted only clarifications, even though the awardee provided information not included in its proposal); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 313 (2006) ("The 'acid test' for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal.") (quotation omitted).



[redacted]

proposals.") (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 663 (2002)). Gov't Br. 19-21; M1 Br. 23-27.

DI variously asserts that a competitive range was established. That claim is simply not true and is belied by the Record. *See, e.g.*, AR 745-46 ("The determination means that *a competitive range . . . will not be established.*"); *accord* AR 757, 783, 792. Perhaps recognizing the lack of Record support for its assertion, DI resorts to the suggestion that a "*de facto* competitive range" of one was formed because the Air Force "excluded" DI's proposal [redacted]. No such exclusion took place here.[3] Even assuming, *arguendo*, that this were the case, it would not result in a "*de facto* competitive range."

DI's claim disregards the *essential* requirement that the contracting officer conducts discussions with those offerors within the competitive range. A "competitive range" refers to those highly-rated proposals that the contracting officer selects *solely for the purpose of conducting discussions*. *See* FAR 15.306(c). The cases are clear that a "competitive range" is not formed by default, as DI suggests, merely because some proposals are deemed unacceptable

---

[3] As M1 pointed out in its original Brief, the Record establishes that DI's proposal was fully considered and evaluated at every meaningful point in the source-selection process, up to and including the SSA's final best-value trade-off determination on the final pages of the SSDD. *See* M1 Br.15-17. Notwithstanding DI's citation to the PAR for the suggestion that the Air Force [redacted] the Air Force continued to fully evaluate the proposal. In fact, the Air Force would have had to continue to evaluate DI's proposal so that it could ultimately determine whether it was in the Government's best interest to award the contract to M1 without discussions, as stated in the Solicitation. *See* AR 174 (Solicitation ¶ M-2.1). As the Air Force continued to evaluate DI's proposal, it might have determined—but did not do so—that [redacted], it would be in the Government's best interest to conduct discussions with DI to try to to [redacted]. However, the SSA decided that award to the higher-priced, higher technically rated proposal submitted by M1 was justified because "the technical superiority and overall business approach of M1['s] proposal outweigh[ed] the relatively small price difference." AR 807. Ultimately, the Air Force determined that its best interests did not merit discussions with either offeror.



[redacted]

for award and only a few—or even only one, as in this case—are left standing and award is made without discussions.[4] Even if DI's proposal was deemed not capable of award—which is not supported by the Record—the mere fact that the agency had only one technically-qualified proposal (M1's) does not mean that the agency *also* had a "competitive range" of one, because discussions were not conducted and discussions are the *sine qua none* of a competitive range.

Since there was no competitive range formation here, the *Birch* decision and the standards it espoused should be inapposite to the Court's present review.[5]

DI repeatedly bemoans that its [redacted] could have been remedied "easily" through discussions. *See* DI Resp. 5, 7. Notwithstanding that possibility, however, the SSET, the Contracting Officer ("CO"), and the SSA all agreed that M1's proposal would have remained the superior choice. [redacted] Accordingly, the Air Force would not have gained any benefit from conducting discussions with DI [redacted]

[4] The Court of Federal Claims has recognized a "de facto competitive range" in only limited circumstances where the agency engages in exchanges that amount to "discussions" with only one offeror, without adequately conducting discussions with other similarly-situated offerors. A "de facto competitive range" does not exist where offerors are deemed technically not capable of award and another offeror is subsequently awarded the contract without any discussions. *See Dubinsky v. United States*, 43 Fed. Cl. 243, 264 n. 51 (1999); *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 730-31 (1987); *M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23-34 (1986).

[5] However, even if the Record were somehow interpreted to reveal that a competitive range of one was formed, DI's proposal would not have merited inclusion in that range because the Air Force had already determined that there was a "[l]ow [p]robability" that discussions would have aided DI in overtaking M1's superior proposal. See AR 808, 783.



[redacted]

[redacted] because those discussions, as the SSET, CO and SSA have already stated in the Record, would not have changed the source selection decision.[6]

Furthermore, if there were a competitive range determination here, *Birch* does not counsel any different approach or strip a contracting officer of the ability to make the evaluative decisions noted above. The *Birch* decision and its "close scrutiny" requirement are built around the regulatory requirements and the duties that existed *prior* to the 1997 FAR Part 15 re-write. In essence, the "rule" of *Birch* was that "the FAR does not allow a contracting officer to eliminate competitors from the initial competitive range if there is *any 'reasonable chance'* that they will be selected." *Birch*, 4 F.3d at 973 (quoting their current FAR). The Circuit noted a tension between "the necessarily broad discretion" an agency typically has in determining whether a bid is competitive and the "mandate of the FAR" in its then-current version that "*when there is doubt, the questionable bid should be included.*" *Id.*

This focus on the old "reasonable chance" language in the FAR drove the Circuit's conclusion that a competitive range of one was subject to close scrutiny because, for a competitive range of one to exist, "there must [have been] a clear showing that the excluded bids *have 'no reasonable chance'* of being selected." *Id.* at 974. The Court reasoned further that "[i]t is well established that a proposal must generally be considered to be within the competitive range *unless it is so technically inferior or out of line as to price, as to render discussions meaningless*." *Id.* (quoting *M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986); *Falcon*

---

[6] As the FAR Council noted in the course of the notice and comment period for the FAR Part 15 revision in 1997, "[r]etaining marginal offers in the [competitive] range imposes additional, and largely futile, effort and cost on both the Government and industry." 62 Fed. Reg. 51224, 51226 (Sept. 30, 1997). Moreover, "the new standard has the derivative benefit of encouraging offerors to submit better, more robust initial proposals in recognition of the fact that only the most highly rated proposals will be included in the competitive range." *Id.*



[redacted]

*Sys., Inc.*, B-213661, June 22, 1984, 84-1 CPD ¶ 658). This high standard for *excluding* proposals from a competitive range required a high level of judicial scrutiny to determine if the competitive range determination was sound; there was little room for a contracting officer to exercise discretion in the evaluation.

In other words, the "*reasonable chance*" language of the then-current FAR 15.609(a), and the attendant requirement that proposals be included in the competitive range if there was any "doubt" as to their merit, were the implicit lynchpins of *Birch* and the "close scrutiny" standard. *See Birch,* 4 F.3d at 973-74. In turn, all of the decisions in the Court of Federal Claims that ascribe to the "close scrutiny" standard have done so relying directly or indirectly on *Birch* or the same regulatory scheme that *Birch* addressed.[7]

In 1997, however, the FAR Council eliminated the "reasonable chance" language. Therefore, to the extent that *Birch* and subsequent cases relied on that phrase in the pre-1997 FAR for the rule that "the FAR does not allow a contracting officer to eliminate competitors from the initial competitive range if there is *any 'reasonable chance'* that they will be selected," that rule, and the precedent of *Birch*, have been superseded by the revision.

Under the new relevant FAR provision, FAR 15.306(c)(1), a contracting officer now has substantially more discretion in determining which are "the most highly rated proposals," and the need for close scrutiny when there is a competitive range of one has been eliminated. The GAO has noted that the FAR Part 15 rewrite *no longer* requires "that agencies retain in the competitive

---

[7] *See, e.g.*, *Chapman Law Firm Co. v. United States*, 71 Fed. Cl. 124, 132 (2006); *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 320, 339 (2000); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 44 Fed. Cl. 540, 553 (1999), *rev'd on other grounds*, 238 F.3d 1324 (Fed. Cir. 2001); *Pikes Peak Family Housing, LLC v. United States*, 40 Fed. Cl. 673, 678 (1998); *W&D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 642-43 (1997); *Rockwell Int'l Corp. v. United States*, 4 Cl. Ct. 1, 5 (1983) (relying on a regulatory scheme similar to pre-1997 FAR 15.609(a)).



[redacted]

range a proposal that is determined to have no responsible prospect of award simply to avoid a competitive range of one." *SDS Petroleum Prods., Inc.*, B-280,430 Sept. 1, 1998, 98-2 CPD ¶ 59; *see also Brian X. Scott*, B-298,568, Oct. 26, 2006, 2006 CPD ¶ 156; *TekStar, Inc.*, B-295,444, Feb. 18, 2005, 2005 CPD ¶ 53; *Fiserv NCSI, Inc.*, B-293,005, Jan. 15, 2004, 2004 CPD ¶ 59. That conclusion significantly modifies the approach that existed prior to the Part 15 Re-write, and on which Plaintiff appears to rely here.

**C. The Absence of Any Legal Duty of the Contracting Officer to Conduct Clarifications or Discussions with Either Offeror If the Agency Intends to Award Without Discussions.**

The most relevant authority on this matter, as it relates to the facts of this case, is the FAR itself. The FAR explicitly permits an award "*without* discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions." FAR 15.306(a)(3). There is no question that the Air Force, in the RFP and elsewhere, repeatedly and consistently alerted offerors that it intended to award without discussions. *See* Gov't. Br. 5-6; M1 Br. 7. That is precisely what it did. *See Rig Masters*, 70 Fed. Cl. at 421 ("The Solicitation placed all potential bidders, including plaintiff, on notice that the Corps of Engineers intended to award the contract without discussions. The Corps acted within its discretion and consistent with the Solicitation when it rejected plaintiff's initial proposal and was not obligated to enter into discussions with plaintiff.").

Regardless of the number of offerors, there was no requirement that the agency form a competitive range or conduct discussions with any offerors. So long as the Air Force announced in the Solicitation that it *intended to make award without discussions*, and at least one initial proposal satisfied its needs and was qualified for award, the agency was within its discretion to



[redacted]

award the contract based on the relative strengths of initial proposals and without discussions—*even if there was only one other offeror.*

It is axiomatic that *if* the Air Force had conducted discussions with one offeror in this procurement, it would have been required to conduct discussions with both offerors, unless it had previously established a formal competitive range of just M1, which it did not do here. FAR 15.306(d)(1); *Dubinsky v. United States*, 43 Fed. Cl. 243, 264 n. 51 (1999); FAR 15.307(a)(3).

Finally, the FAR does not require that a procuring agency conduct clarifications with any particular number of offerors. Nor does the FAR mandate that clarifications be held with all offerors if they are conducted with any offeror. "Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a)(1). Contrary to DI's assertion, there was no need for the Air Force to issue clarifications to DI simply because it had issued clarification ENs to M1.[8] By contrast, the FAR *does* mandate two other types of exchanges in FAR 15.306. "Communications," for instance, "*[s]hall* be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range," and "*[m]ay only* be held with those offerors … whose exclusion from, or inclusion in, the competitive range is uncertain." FAR 15.306(b)(1). "Discussions," of course, are required of all offerors within the competitive

[8] Moreover, clarifications alone would not have corrected DI's failure to address the material technical evaluation requirement for an MIS training process. DI's Response Brief notes repeatedly that its proposal could have been cured "easily" through "discussions." Indeed, DI would have needed "discussions" to remedy the void in its technical proposal. [redacted]



[redacted]

range. FAR 15.306(d)(1) ("Discussions . . . *must* be conducted by the contracting officer *with each offeror* within the competitive range.").

Since the FAR Council thus well knew how to require an agency to engage in exchanges with offerors, the fact that the FAR does not require clarifications with all offerors (or any particular category of offerors) shows that no such obligation exists. Clarifications may thus be limited to a single offeror. *See, e.g., Gulf Copper Ship Repair, Inc.*, B-293,706.5, Sept. 10, 2004, 2005 CPD ¶ 108 ("[C]larifications may be requested from just one offeror."); *Priority One Servs., Inc.*, B-288,836, Dec. 17, 2001, 2002 CPD ¶ 79 (same); *Tri-State Gov't Servs., Inc.*, B-277,315, Oct. 15, 1997, 97-2 CPD ¶ 143 (same).

**D. The DCMA-Approved Purchasing System Was Merely a Factor for Consideration <u>in the Agency's Responsibility Determination and Was Not a Material Requirement.</u>**

The only discussion of M1's accounting and purchasing systems in the source selection decision-making process is in the context of the agency's responsibility determination—the Air Force's "Determination of Contractor Responsibility for Contract Award." *See* AR Tab 17. The information about these systems was reviewed solely so that the agency could assess whether M1 "has the organization, experience, accounting and operational controls, and technical skills necessary to perform the services required under the contract." AR 813. Clearly, this information was only relevant to the agency's responsibility determination, which the agency conducted pursuant to FAR 9.104. *See* AR 811 ("Prior to making a determination of responsibility, the [CO] shall obtain information sufficient to be satisfied that the contractor currently meets the applicable standards of FAR 9.104, Standards"). Furthermore, this is not a situation in which the Air Force developed "special standards" of responsibility that could be



[redacted]

considered to be definitive responsibility criteria under FAR 9.104-2, which requires that "special standards" be identified as such in the solicitation.

An instructive decision on this issue is this Court's decision in *Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716 (1999). There, the Court applied a rigorous analysis of the plain language and the scheme of the solicitation ("the terms of that provision as a whole") to determine whether a particular past performance requirement was among the "general responsibility standards" that are encompassed in a contracting officer's subjective responsibility determination under FAR 9.104-1 or was instead a "definitive responsibility criteria" under FAR 9.104-2. *See* 43 Fed. Cl. at 720-22. The same rigor and focus on the plain language of Solicitation ¶ L-10.3.1 here shows that the existence of a DCMA-approved purchasing system was merely a factor to be considered among other general responsibility information under FAR 9.104-1. The plain language of the pertinent RFP provision establishes that a DCMA-approved purchasing system was not a "requirement," at all, but rather was conditional on the offeror having a non-mandatory CAS disclosure statement.

Not every contractor is required to have a CAS disclosure statement or comply with the Cost Accounting Standards. Per the FAR, "[a] Disclosure Statement is a written description of a contractor's cost accounting practices and procedures. The submission of a new or revised Disclosure Statement is *not required . . . from any small business concern*." 48 CFR 9903.202-1(a). The Solicitation here specifically accounted for the fact that, for some offerors—like small business concerns such as M1—a CAS disclosure statement or CAS-compliance might not be an applicable requirement. It conditioned submission of the CAS disclosure statement/compliance information on the applicability of such requirements on the offeror. That is why ¶ L-10.3.1 stated:



[redacted]

> Since a portion of the contract requirements will be included on a cost-reimbursable basis, *provide a copy of your disclosure statement* with the proposal as well as identification of compliance with Cost Accounting Standards (CAS), *if applicable*, and any CAS violations and subsequent corrections.

AR 161; M1 Br. 46-47.

The submission of documentation of a DCMA-approved purchasing system was similarly only a contingency. It was tied to the same practical caveat that some offerors may not be required to have a CAS disclosure statement or comply with CAS, like M1 in this case.[9] Accordingly, the Solicitation only required an offeror to provide "documentation of a [DCMA]-approved purchasing system *which is in compliance with your disclosure statement*." AR 161; M1 Br. 46-47.

Thus, if an offeror is not required to comply with CAS or have a CAS disclosure statement, and the Solicitation request for such a disclosure statement is therefore not "*applicable*" to that offeror, it follows logically that documentation of a DCMA-approved purchasing system which is "in compliance" with that disclosure statement would not be applicable, either. That was precisely the manner in which ¶ L-10.3.1 applied to M1.

For the same reason, the foregoing provision cannot prescribe a definitive responsibility criterion. If a solicitation provision is inextricably linked to another solicitation provision (here, the CAS disclosure statement) that is not "applicable" to all offerors, such a criterion cannot be interpreted to be a "definitive responsibility criteria" under FAR 9.104-2. *See Tomkins*, 43 Fed. Cl. at 722 ("[T]he language of a [solicitation] must be given the meaning that a reasonably

[9] [redacted]



[redacted]

intelligent person acquainted with the contemporaneous circumstances would reach.") (quotation omitted).

Application of the *Tomkins* analysis to the provisions here shows, by the plain language of the Solicitation, that the DCMA-approved purchasing system is only a "requirement" if it is "applicable" to an offeror. Since circumstances exist where CAS compliance, a CAS disclosure statement, and an attendant DCMA-approved purchasing system are not "applicable"—particularly for small business concerns like M1—a DCMA-approved purchasing system cannot be deemed a "definitive responsibility criteria" for that group of offerors.[10]

Even if the DCMA-approved purchasing system were not inextricably linked to the non-mandatory CAS information, this solicitation provision would still not establish a definitive responsibility criterion under FAR 9.104-2 because the Solicitation does not identify any "special standards" that would apply to the responsibility determination. The absence of any such reference is significant because the FAR requires that, if the agency intends to impose "definitive responsibility criteria," such special standards must be set forth in the solicitation and *"so identified"* as special standards. *See* FAR 9.104-2(a). There is no such designation of the DCMA-approved purchasing system as a special responsibility standard in the RFP (or elsewhere in the Record).

---

[10] Nor can the DCMA-approved purchasing system be deemed a material solicitation requirement that goes to responsiveness, rather than responsibility. As this Court has recognized, "[m]aterial nonconformity goes to the substance of the bid which affects the price, quality, quantity, or delivery of the article or service offered." *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522 (1991). Responsibility, on the other hand, "addresses the issue of the performance capability of a bidder, which can include inquiries into financial resources, experience, management, past performance, place of performance, and integrity." *Id.* "In contrast to responsiveness, a bidder may present evidence of responsibility after bid opening up until the time of award." *Id.* at 522-23.



[redacted]

Instead, the type of information requested in both RFP ¶ L-10.3.1 and ¶ L-10.3.2 is exactly the type of information that would typically be considered in determining "general standards" of responsibility under FAR 9.104-1. For example, this section requires that offerors must "have adequate financial resources to perform the contract, or the ability to obtain them" and "have the necessary organization, experience, accounting and operational controls . . . ." FAR 9.104-1. These "general standards" of responsibility are entirely consistent with the type of information requested in the Solicitation, including documentation of M1's accounting compliance programs and "information regarding the general financial condition of your firm and specific plans . . . for financing." AR 161. There is nothing "special" or "definitive" about a DCMA-approved purchasing system. It is merely one of several factors that the Air Force could have, and did, consider to determine that M1 "has the . . . accounting and operational controls . . . to perform the services required under the contract" consistent with the requirements of FAR 9.104-1(e). AR 813.

## III. <u>The ENs Were Merely "Clarifications" on Their Face, In Form, and In Substance</u>

Each of the ENs issued to M1 was nothing more than a clarification that was not intended to revise, did not invite revision of and, in fact, did not result in revision of M1's proposal. The Air Force source selection documents repeatedly refer to the ENs as "clarifications" and state that neither offeror, including M1, would have an opportunity to revise its proposal. *See* M1 Br. 34-35. The ENs were clearly marked as "clarifications." *See* AR Tab 13. The agency, therefore, issued and reviewed the ENs as clarifications that could not revise M1's proposal. Gov't Br. 21-25. As the Federal Circuit has instructed, the agency's designation of ENs as "clarifications" should receive deference. *Info Tech.*, 316 F.3d at 1323 (quoting *AT&T*, 307 F.3d at 1379).



[redacted]

Moreover, the sum and substance of the ENs reveal that they are entirely consistent with the FAR's scheme for clarifications, were not discussions, and did not afford M1 an opportunity to revise its proposal. ENs P-2 and P-3 requested M1 to [redacted]. AR 663-65; Gov't Br. 24-25; M1 Br. 38-39. As noted above and in the Air Force and M1 briefs, both of these matters (and all of the Solicitation requirements under § L-10.3, Information Other Than Cost or Pricing Data, AR 161) related solely to the Air Force's responsibility determination under FAR 9.104-1. *See* Gov't Br. 24-25; M1 Br. 34-35.

The case law is clear that "[a] request for, or providing of, information that relates to offeror responsibility, *rather than proposal evaluation, does not constitute discussions and thus does not trigger the requirement to hold discussions with other competitive range offerors.*" *Gen. Dynamics*, B-295,987, May 20, 2005, 2005 CPD ¶ 114 (quoting *A.B. Dick Co.*, B-233,142, Jan. 31, 1989, 89-1 CPD ¶ 106); *accord Thermal Reduction Co.*, B-236724, Dec. 7, 1989, 89-2 CPD ¶ 527 ("Questions pertaining to an offeror's capacity and capability involve issues of responsibility, that is, the offeror's ability to perform the contract, as opposed to the acceptability of its proposal, and therefore may be requested or provided without resulting in the conduct of discussions."). These ENs, which did not involve any evaluation criteria but were solely used in conjunction with the agency's responsibility determination, *see* AR Tab 17, were therefore not discussions.[11]

[11] *See also Overlook Sys. Techs., Inc.*, B-298099.4, Nov. 28, 2006, 2006 CPD ¶ 185 (quoting *Gen. Dyn.*, B-295987); *Kahn Instruments, Inc.*, B-277973, Dec. 15, 1997, 98-1 CPD ¶ 11 (noting that "even where the solicitation requests" specific information, if that information relates only to responsibility then exchanges regarding the information do not constitute discussions); *Adrian Supply Co.*, B-239681, Aug. 28, 1990, 90-2 CPD ¶ 170 (noting that "there is no prohibition against an agency communicating with a bidder after bid opening concerning issues relating to the firm's responsibility" and that such exchanges do not constitute discussions); *Ask Mr. Foster Travel Div.*, B-238305, May 9, 1990, 90-1 CPD ¶ 460.



[redacted]

In EN MC-2, the Air Force did not afford M1 an opportunity to revise its proposal with respect to [redacted]. Instead, the Air Force merely asked M1 to [redacted]. M1's response provided [redacted] and did not alter or revise its proposal. This EN did not lead to a discussion merely because it resulted in additional information from M1 because, as the Federal Circuit noted, "*[a]ny meaningful clarification* would require the provision of information." *Info. Tech.*, 316 F.3d at 1323.

Moreover, through the final evaluation document, the SSDD (which was issued after receipt of M1's ENs), the Air Force continued to evaluate *only* the terms of M1's initial proposal. Although DI accused M1 of revising its proposal by estimating in its EN response that [redacted] If M1 had "revised" its proposal, then the terms of its supposed "revision" would have been incorporated into the source selection decision-making. They were not. Moreover, the SSDD reiterated that M1 had been issued a clarification EN to [redacted], "by which [M1] is given the opportunity to *clarify this aspect* of the proposal." AR 798.[12]

12 [redacted]



[redacted]

Finally, Plaintiff alleges that "M1 illegally modified its offer post award" based on its response to EN MC-3, [redacted]. DI Resp. 26-28. This allegation is baseless, because it is premised on the misunderstanding that the Air Force's decision [redacted] There is no evidence in the Record that M1 ever revised its proposal at all, let alone *after* the source selection decision, and DI's allegation to the contrary is simply wrong.

DI contends that "[redacted] DI Resp. 27. DI does not produce any support for this allegation, but nonetheless proceeds to use it as the sole basis for a claim that MI both engaged in discussions *and* modified its offer after award, resulting in an "illusory" award. *Id.* at 26-28. Nowhere does the Record even remotely support an allegation that M1 revised [redacted] The Solicitation specifically stated that the Government "may incorporate into the contract" those proposal features that exceed technical minimum requirements, but there was no obligation for it to do so. *Id.* [redacted]

---

[redacted]



[redacted]

[redacted] Nowhere in M1's response to EN MC-3—or anywhere else in the Record—is there any suggestion [redacted]

[redacted]

[redacted]

[redacted]

The plain fact is that M1's response to EN MC-3 merely clarified the Air Force's misunderstanding [redacted] *See* M1 Br. 36-37; *accord* Gov't Br. 24. As the PAR makes clear, [redacted]



[redacted]

[redacted] As DI concedes, "where the offeror is merely confirming what is set forth in its proposal, this Court has held that the communications do not constitute discussions." DI Resp. 14 (citations omitted).

Furthermore, [redacted] As noted above, the Solicitation stated that strengths "may" be incorporated into the ultimate contract; it never suggested that proposal strengths could be evaluated as strengths "only" if they were ultimately included in the Contract.

## IV. Conclusion

For the foregoing reasons, as well as those previously stated in the Government's and M1's briefs, this Court should deny DI's Motion for Judgment on the Administrative Record and grant the Government's and M1's Cross-Motions for Judgment on the Administrative Record.



[redacted]

Respectfully submitted,

/s/ Philip J. Davis

Philip J. Davis
(Counsel of Record)

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel: 202.719.7044
Fax: 202.719.7049

*Counsel for*
M1 SUPPORT SERVICES LP

Of Counsel:
William A. Roberts, III
Richard B. O'Keeffe, Jr.
Jon W. Burd
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006

Dated: March 6, 2007



[redacted]