**AGREED-UPON REDACTED COPY–
MAY BE MADE PUBLIC**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DYNCORP INTERNATIONAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-84C |
| v. | ) | Bid Protest |
| | ) | (Judge Bush) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| M1 SUPPORT SERVICES LP, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

**DEFENDANT'S MOTION FOR**
**<u>JUDGMENT UPON THE ADMINISTRATIVE RECORD</u>**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

TODD M. HUGHES
Assistant Director

OF COUNSEL:

MAJOR CHRISTOPHER M. SCHUMANN
Commercial Litigation Division
Air Force Legal Operations Agency
1501 Wilson Blvd., Suite 604
Arlington, VA 22209-2403

DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2279
Fax: (202) 305-7643

February 26, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Background Information On Acquisition . . . . . . . . . . . . . . . . . . . . . . . . 4

B. Award Without Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. The Air Force's Evaluation Of Proposals . . . . . . . . . . . . . . . . . . . . . . . . 6

1. Source Selection Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

a. Mission Capability And Proposal Risk . . . . . . . . . . . . . . . 7

b. Past Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

c. Price/Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D. Evaluation Of DynCorp's And M1's Proposals . . . . . . . . . . . . . . . . . . . . 9

1. Technical Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2. Past Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3. Price/Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

E. Award Of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. The United States Is Entitled To Judgment Upon The Administrative Record . . 15

A. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. The Air Force Has Not Acted Arbitrarily Or Capriciously And Has Not Violated Any Applicable Procurement Statute Or Regulation . . . . . . . . 18

1. The Air Force Did Not Disqualify DynCorp Or Establish A Competitive Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2. The Air Force Did Not Conduct Illegal Discussions With M1 . . 21

a. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

b. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

c. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

d. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . 24

e. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

f. EN Regarding [*****] . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3. The Air Force Was Not Required To Conduct Discussions With DynCorp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. The Air Force Made A Proper "Best Value" Determination In Making The Award To M1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1. DynCorp's Disagreement With The Air Force's Evaluation Of The Proposals Is Not Sufficient To Show The Evaluation Was Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. The Award To M1 Was Reasonable And Was Not "A Close Call" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. M1's Proposal Was Eligible For Award . . . . . . . . . . . . . . . . . . . . 32

II. DynCorp Has Failed To Establish That It Is Entitled To An Injunction . . . . . . . 34

A. Standard For Obtaining Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . 34

B. Success On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

C. Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D. Balance Of Harms And Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . 36

**TABLE OF AUTHORITIES**

Page

Federal Cases

Aerolease Long Beach v. United States,
31 Fed. Cl. 342 (1994) . . . . . 28

Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,
56 Fed. Cl. 502 (2003) . . . . . 26

Banknote Corp. of Am., Inc. v. United States,
56 Fed. Cl. 377 (2003) . . . . . 17

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) . . . . . 18

Bean Stuyvesant, L.L.C. v. United States,
48 Fed. Cl. 303 (2000) . . . . . 17, 19, 30, 34

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,
419 U.S. 281 (1974) . . . . . 16

Cube Corp. v. United States,
46 Fed. Cl. 368 (2000) . . . . . 17

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996) . . . . . 16, 31

DSD Labs., Inc. v. United States,
46 Fed. Cl. 467 (2000) . . . . . 28

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir.1996) . . . . . 17

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755 (1985) . . . . . 16

Firearms Training Sys., Inc. v. United States,
41 Fed. Cl. 743 (1998) . . . . . 19, 20

Foundation Health Fed'l Servs. v. United States,
1993 WL 738426 (D.D.C. 1993) . . . . . 35

Four Points By Sheraton v. United States,
63 Fed. Cl. 341 (2005) . . . . . 16

Galen Med. Assocs., Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) . . . . . 17, 23

Hawpe Constr., Inc. v. United States,
46 Fed. Cl. 571 (2000) . . . . . 35

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) . . . . . 15, 16, 35

Info. Tech. & Applications Corp. v. United States,
316 F.3d 1312 (Fed. Cir. 2003) . . . . . 22, 23, 26

Int'l Res. Recovery, Inc. v. United States,
64 Fed. Cl. 150 (2005) . . . . . 23

JWK Int'l Corp. v. United States,
52 Fed. Cl. 650 (2002) . . . . . 16, 27, 30

Kentron Haw., Ltd. v. Warner,
480 F.2d 1166 (D.C. Cir. 1973) . . . . . 16

Lion Raisins, Inc. v. United States,
51 Fed. Cl. 238 (2001) . . . . . 18

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) . . . . . 35

Novell, Inc. v. United States,
46 Fed. Cl. 601 (2000) . . . . . 28

Rig Masters, Inc. v. United States,
70 Fed. Cl. 413, 420 (2006) . . . . . 17, 27, 31, 35

Saratoga Dev. Corp. v. United States,
21 F.3d 445 (D.C. Cir. 1994) . . . . . 16

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) . . . . . 18

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,
758 F.2d 669 (D.C. Cir.1985) . . . . . 35

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983) . . . . . 36

## Federal Statutes

10 U.S.C. § 2305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

41 U.S.C. § 253b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Federal Regulations

48 C.F.R. § 9903.201-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

AFFARS § 5315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19

FAR § 15.306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22, 23, 25

FAR § 19.1307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FAR § 52.215-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## GAO Decisions

Carlson Wagonlit Travel, Comp. Gen. Dec. B-287,016,
2001 CPD ¶ 49, 2001 WL 254317 (Mar. 6, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

Falcon Systems, Inc., Comp. Gen. Dec. B-213,661,
84-1 CPD ¶ 658, 1984 WL 46220 (June 22, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Omega World Travel, Comp. Gen. Dec. B-283,218,
2002 CPD ¶ 5, 1999 WL 33456229 (Oct. 22, 1999) . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

PEMCO World Air Servs., Comp. Gen. Dec. B-284,240.3,
2000 CPD ¶ 71 (Mar. 27, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DYNCORP INTERNATIONAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-84C |
| v. | ) | Bid Protest |
| | ) | (Judge Bush) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| M1 SUPPORT SERVICES LP, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

**DEFENDANT'S MOTION FOR**
**JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's order dated February 14, 2007, defendant, the United States, respectfully requests that the Court enter judgment upon the administrative record in favor of the United States, deny plaintiff's motion for judgment upon the administrative record and request for a permanent injunction, and dismiss plaintiff's complaint. Plaintiff, DynCorp International, LLC ("DynCorp"), seeks to overturn the contract award made by the United States Air Force ("the Air Force") to intervenor, M1 Support Services, LP ("M1"). As set forth more fully below, the administrative record in this action demonstrates that the Air Force acted properly in making the award, and that DynCorp cannot demonstrate that the Air Force acted arbitrarily or capriciously in making the award. In support of our motion for judgment upon the administrative record, we rely upon the complaint, the administrative record filed with the Court on February 9, 2007 and supplemented on February 14, 2007, and the following brief.

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUES

1. Whether the Air Force's decision not to establish a competitive range or conduct discussions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."

2. Whether the Air Force properly evaluated the proposals in accordance with the standards set forth in the solicitation.

3. Whether the Air Force properly determined that M1's proposal provided the best value for the Government.

4. Whether DynCorp is entitled to a permanent injunction.

## STATEMENT OF THE CASE

I. Nature Of The Case

This case involves a post-award protest by DynCorp. DynCorp challenges the Air Force's award of contract no. FA4890-07-C-0003 ("the CAM contract") to M1 for Consolidated Aircraft Maintenance ("CAM") services at three Air Force bases ("AFB"). AR 867, 792-93.[1] On July 3, 2006, the Air Combat Command Contracting Squadron ("ACC CONS") issued solicitation no. FA4890-06-R-0165 ("the solicitation" or request for proposals ("RFP")) in order to acquire services for the intermediate and organizational maintenance for the Air Combat Command ("ACC") Companion Trainer Program ("CTP") T-38A aircraft located at Holloman AFB, New Mexico; Beale AFB, California; and Whiteman AFB, Missouri. AR 66, 743. The solicitation set forth the requirements for the contract. See AR 66-454. Three amendments to

---

[1] "AR__" refers to the administrative record that was filed with the Court on February 9, 2007, and supplemented on February 14, 2007.

the solicitation were issued. AR 744. The closing date for proposals was August 7, 2006, and two proposals were received by that deadline. AR 745.

The acquisition was a competitive negotiated acquisition, and the source selection decision was made based upon a best value determination. AR 745. The acquisition was conducted in accordance with Federal Acquisition Regulation ("FAR") Part 15, Contracting by Negotiation. Id. After the award was made to M1 on December 21, 2006, DynCorp, the incumbent contractor and the only other offeror, requested a debriefing. AR 1245. A debriefing was held on January 16, 2007. Id.

On February 2, 2007, DynCorp filed a complaint in this Court, seeking injunctive and declaratory relief. Compl. at pg. 16-17.[2] DynCorp alleges that the Air Force irrationally excluded DynCorp from the competitive range and unreasonably failed to conduct discussions, that the evaluation of DynCorp's proposal was arbitrary and capricious, that the evaluation of both offerors under the transition/phase in subfactor was irrational and inconsistent with the RFP, that the evaluation of both offerors' past performance was arbitrary and capricious, and finally, that the Air Force illegally conducted discussions only with M1. Compl. at pgs. 10-16. DynCorp filed its motion for judgment upon the administrative record on February 20, 2007, arguing that the Air Force's disqualification of DynCorp's proposal without discussions was unlawful, that the Air Force conducted illegal discussions with M1, and that M1's proposal was ineligible for award. Pl. Mot. at 20-34.[3] As will be demonstrated below, all of DynCorp's arguments are

[2] "Compl.__" refers to the complaint that was filed by plaintiff on February 2, 2007.

[3] Because DynCorp now appears to abandon Counts III and IV of its complaint (that the Air Force's evaluation of the Transition/Phase-in subfactor was irrational and that the Air Force's past performance evaluation was arbitrary and capricious), Compl. at pgs. 13-15, we do not address those counts in this brief. However, we reserve the right to address those claims should DynCorp raise them in its response to our cross-motion.

without merit and the Air Force conducted the CAM acquisition in accordance with all applicable statutes and regulations.

## II. Statement Of Facts

### A. Background Information On Acquisition

As noted above, the CAM contract provides for the intermediate and organizational maintenance of the ACC CTP T-38A aircraft. AR 743. The T-38A aircraft is a twin-engine, high altitude, supersonic jet trainer used in a variety of roles by the Air Force. Id. Organizational maintenance on the T-38A aircraft is performed at all three AFBs. Id. Intermediate maintenance is only performed at Holloman AFB. Id. Organizational maintenance involves services performed on the aircraft ("on-equipment" maintenance) and pertains to launch and recovery efforts on the flight-line. Id. Intermediate maintenance involves shop services such as engine maintenance that is performed on equipment that has been removed from the aircraft ("off-equipment" maintenance). Id. The contract also requires additional maintenance support services at Holloman and Whiteman AFBs. Id.

The contractor is required to provide program management, operations and maintenance, mission support, and transition services in an effective and efficient manner for the T-38A aircraft as defined in the performance work statement ("PWS"). AR 743; see AR 180-229. The contractor shall provide all management, personnel, equipment, tools, supplies, materials, supervision, items, and services necessary to perform the CAM services as defined in the PWS. Id.

The CAM contract is a fixed-price with an award fee and cost-reimbursable line items contract. AR 810. The contract includes a two-month transition period beginning on February 1, 2007, and ending on March 31, 2007. Id. The initial performance period for the contract is for

six months beginning on April 1, 2007, and ending on September 30, 2007. Id. Following the initial performance period, there are four, one year options. Id.

The incumbent contract, performed by DynCorp, was awarded on August 26, 1999 and is scheduled to expire on March 31, 2007. AR 744.

B. Award Without Discussions

Before the proposal deadline, bidders for the CAM acquisition were provided with clear notice that the Air Force did not plan to conduct discussions with offerors after the receipt of proposals. The RFP incorporated FAR § 52.215-1. AR 151. That provision provides, in part:

> The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary.

FAR § 52.215-1(e)(4), 48 C.F.R. § 52.215-1(e)(4). Additionally, Section M of the solicitation stated, "the Government intends to award without discussions. The Government may make a final determination as to whether the offeror's proposal is acceptable or unacceptable solely on the basis of the initial proposal as submitted." AR 173 (¶ M-1.3). Section M also stated that although the Government intended to make an award based upon initial proposals, "discussions or negotiations may be held and result in a request for a Final Proposal Revision. If it is determined to be in the best interest of the Government to hold discussions, the Government will decide which proposals are in the competitive range." AR 174 (¶ M-2.1).

At the post site visit meeting held for potential offerors on June 9, 2006, the Air Force responded to a question of whether the contract will be awarded with or without discussions. AR 597. The Air Force responded:

> The Government intends to evaluate proposals and award a contract without discussions with offerors. Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary.

Id. Accordingly, all offerors were on notice that the Air Force intended to award the CAM contract without discussions or negotiations.

C. The Air Force's Evaluation Of Proposals

1. Source Selection Procedures

The source selection for the CAM acquisition was a "best value" determination. AR 745. "'Best value' means the expected outcome of an acquisition that, in the government's estimation, provides the greatest overall benefit in response to the requirement." Id. A best value determination includes a trade-off process that permits trade-offs among cost and non-cost factors and allows the Government to accept a proposal that is not the lowest price proposal. Id. Any features or technical offerings contained in the proposals that exceed the requirements of the PWS, and that are determined to provide added value to the Government, may be considered in a best value determination. AR 745.

Proposals were evaluated using four evaluation factors: (1) Mission Capability, (2) Proposal Risk, (3) Past Performance, and (4) Price/Cost. AR 746.

> The factors are defined as follows: (1) Mission Capability - Offeror's capability to satisfy the government's requirements with technical, performance or capability requirements being addressed, (2) Proposal Risk - The risk that the offeror's proposed approach to meeting the requirements of the solicitation will cause significant disruption of schedule, increased costs, or degraded performance, (3) Past Performance - The degree of confidence the government has in an offeror's ability to supply products and services that meet users' needs based on a demonstrated record of performance, and (4) Cost or Price: The cost or price to the government for the supplies or services being acquired.

Id. The solicitation also stated how the evaluation factors would be compared.

> Mission Capability and Proposal Risk are in descending order of importance. Past Performance is equal in importance to Mission Capability. All three (3) factors are more important than the Price/Cost factor. However, Price/Cost will contribute substantially to the source selection decision.

AR 174. A technical team was responsible for evaluating Mission Capability and Proposal Risk. AR 795. A price team was responsible for evaluating price. Id. A performance confidence assessment group ("PCAG") was responsible for evaluating past and present performance. Id. The teams only evaluated the information contained in the proposals. Tuttle Decl. ¶ 4.[4]

a. Mission Capability And Proposal Risk

Mission Capability And Proposal Risk were evaluated at the sub-factor level. AR 174, 794. For Mission Capability, there are three subfactors. They are program management, operations and maintenance, and transition/phase-in. Id. Program management and operations and maintenance are equally important, whereas transition/phase-in is the least important of the three rated sub-factors. Id. The subfactors consisted of aspects. AR 794, 175-76. The aspects for the program management sub-factor are management and integration, human resources, and quality management system. Id. The aspects for the operations and maintenance subfactor are maintenance management program, off-station and operation location aircraft recoveries/repairs, approach to improve aircraft phase inspection turnaround, and maintenance information system data integrity. Id. The aspect for the transition/phase-in subfactor is a transition plan. AR 794, 176.

The subfactors were rated pursuant to the criteria set forth in the Air Force FAR Supplement ("AFFARS") § 5315. AR 174; see also AFFARS § 5315, available at

---

[4] "Tuttle Decl.__" refers to the declaration of Technical Sergeant Beverly Tuttle, attached to this brief.

http://farsite.hill.af.mil/reghtml/regs/far2afmcfars/af_afmc/affars/5315.htm#P59_1675 (last revised June 15, 2006). Each subfactor was evaluated for strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies. AR 794-95. Each subfactor was given a rating of blue/exceptional, green/acceptable, yellow/marginal, red/unacceptable. AR 795. As provided in AFFARS § 5315.305, a proposal that receives a red/unacceptable rating as a result of a deficiency may not be awardable. AR 800. The evaluation of Mission Capability was explained in section M-4 of the solicitation. AR 174-76.

Proposal risk was assessed for all Mission Capability subfactors. AR 795. An overall factor-level rating was not assigned. Id. Proposal risk ratings were either high, moderate, or low. The evaluation of proposal risk was explained in section M-5 of the solicitation. AR 176.

b. Past Performance

The evaluation of past performance was explained in section M-6 of the solicitation. AR 176–78. Each proposal received a performance confidence assessment rating, which was based on each offeror's relevant past and present performance. An offeror could receive a rating of high confidence, significant confidence, satisfactory confidence, unknown confidence, little confidence, or no confidence based upon the Air Force's level of confidence that the offeror will successfully perform the required effort. AR 795.

c. Price/Cost

The evaluation of price/cost was explained in section M-7 of the solicitation. AR 178. For the price/cost factor, the evaluation was conducted on a total evaluated price. AR 795. This consists of the total proposed price for the transition period line items plus all option line items including the offerors' proposed handling rates for purchase of supplies. Id. If applicable, offerors' entitlement to a price evaluation preference was applied in order to arrive at the total

evaluated price. Id. The offerors' proposed prices were evaluated using price analysis techniques. AR 805. Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit. Id.

D. Evaluation Of DynCorp's And M1's Proposals

1. Technical Evaluation

Following the initial evaluation of proposals, the technical team reached a consensus evaluation for each proposal. AR 712; Tuttle Decl. ¶ 3. The Source Selection Evaluation Team ("SSET") presented their findings to the Source Selection Authority ("SSA"). AR 745.

> The SSA accepted the recommendation to award without discussions which means that neither offeror [was] allowed to revise its proposal. . . . The determination means that a competitive range, which is the mostly highly rated of the proposals, will not be established.

AR 745-46 (emphasis added). Because the SSA decided to award without discussions, only clarification evaluation notices ("ENs") were issued, and they were only issued to M1, the apparently successful offeror. AR 783.

> ENs are written exchanges with offerors for purposes of clarifications, communications, or discussions. Communications and discussion ENs pertain to the establishment of a competitive range. No such range will be established for the subject acquisition. Clarification ENs will allow the apparently successful offeror the opportunity to clarify certain aspects of the proposal or to resolve minor or clerical errors. The offeror's responses should not affect the proposal evaluation results.

AR 783 (emphasis added). A total of 6 clarification ENs were sent to M1. AR 668-708. All ENs were sent to resolve minor or clerical errors. AR 783; Cooper Decl. ¶ 3.[5] M1's responses to these ENs were deemed acceptable by the Air Force. AR 655-65. M1's responses did not change

[5] "Cooper Decl.__" refers to the declaration of Contracting Officer Jacquelyn Cooper, attached to this brief.

or affect the evaluation results. Cooper Decl. ¶ 3. M1 was not permitted to revise or change its proposal. Id.

As noted above, the SSET reached a consensus decision in their evaluation of the proposals. The results of the technical evaluation for the Mission Capability subfactors are summarized in the chart below:

| |
|---|
| TABLE<br><br>REDACTED |

AR 795-804. Most notable in the above results are [*****]. The SSA discussed [*****] in great detail:

[*****]

AR 807. In contrast, DynCorp's proposal was found to have [*****]. AR 800. The solicitation clearly stated that the Air Force would be evaluating whether offerors demonstrated "a process of MIS training, data analysis, identification and correction of poor data integrity." AR 175 (Section M, ¶ M-4.4.2.4). The SSA's decision found that:

[*****]

AR 800. [*****]. Id. Moreover, the SSA determined that DynCorp's proposal [*****] AR 800. [*****]. AR 799. In contrast, [*****]. AR 802. For the other subfactors, both offerors [*****]. AR 799, 803.

2. Past Performance

DynCorp and M1 were [*****]. AR 804a.

3. Price/Cost

M1 is a Service-Disabled Veteran-owned, Historically Underutilized Business Zone ("HUBZone"), Women-owned, Veteran-owned small business. AR 757. M1's status as a HUBZone small business concern entitles it to a price preference. See FAR § 19.1307(b), 48 C.F.R. § 19.1307 ("The contracting officer shall give offers from HUBZone small business concerns a price evaluation preference by added a factor of 10 percent to all offers"). With this price preference, M1 had a total evaluated proposed price of [*****] and DynCorp had a total evaluated proposed price of [*****]. AR 806. The proposed prices of both offerors were [*****] based upon (1) adequate price competition[6] and (2) price analysis. AR 806. [*****] AR 807.

E. Award Of Contract

DynCorp was never disqualified from the CAM acquisition. Its proposal was evaluated fully on every factor. AR 796-807. However, following the thorough evaluation of both proposals, the Air Force to decided to award the contract to M1 because its proposal represented the greatest overall benefit to the Government. AR 807. The Air Force determined that M1's proposal could best meet the contract's requirements affordably. Id. The Air Force decided to award the contract to M1, the [*****]. AR 807. The Air Force also determined that there was a low probability that discussions, which would allow the offerors to revise their proposals, [*****]. AR 808. Accordingly, the Air Force awarded the contract to M1 on December 21, 2006. AR 867.

---

[6] Adequate price competition exists when (1) two or more responsible offerors, competing independently, submit price offers that satisfy the Government's expressed requirement, (2) award will be made to the offeror whose proposal represents the best value where price is a substantial factor in source selection, and (3) there is no finding that the price of the otherwise unsuccessful offeror is unreasonable. AR 805.

## SUMMARY OF THE ARGUMENT

The Air Force did not act arbitrarily or capriciously, or violate any applicable statute or regulation when it made the decision to award the CAM contract to M1. Contrary to DynCorp's assertions, the Air Force did not disqualify DynCorp's proposal from the acquisition, and it did not establish a competitive range. The Air Force reasonably decided to make the contract award without discussions based upon its evaluation of the offerors' initial proposals. The Air Force was not required to conduct discussions with offerors when the solicitation clearly stated that it would make the award without discussions. The Air Force only sent ENs to M1 for clarification purposes or to correct clerical or minor errors. The Air Force did not hold discussions with either offeror. In fact, the Air Force determined that there was a low probability that discussions would result in DynCorp's proposal exceeding the ratings of M1's proposal.

The Air Force made a proper "best value" determination when it decided to award the contract to M1. M1's technical proposal [*****], as compared to [*****] DynCorp's proposal. Additionally, DynCorp's proposal [*****]. Although the offerors [*****], the superiority of M1's technical proposal justified the "best value" award to M1. Additionally, M1 was not ineligible for award because it did not provide [*****]. The existence of a [*****] was not a material requirement of the solicitation, and it was not one of the factors evaluated by the Air Force.

Finally, DynCorp has failed to demonstrate that it is entitled to a permanent injunction. DynCorp's general allegations of loss of profit, staff, and business opportunities are not sufficient to establish irreparable harm.

ARGUMENT

I. The United States Is Entitled To Judgment Upon The Administrative Record

A. Standard Of Review

The Court possesses jurisdiction to entertain this action pursuant to the bid protest jurisdiction of the Tucker Act, 28 U.S.C. § 1491(b)(1). Section 1491(b)(4) requires the Court to "review the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA"). This Court reviews bid protest actions pursuant to the standards set forth in the Administrative Procedure Act ("APA"). Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In particular, the Court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Therefore, a bid award may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332 (citations omitted). It is well-settled that the APA does not permit the Court to undertake a de novo review of agency action; rather, it limits the Court to a consideration of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," based solely upon the record before the agency. 5 U.S.C. §§ 702, 706(2)(A).[7]

In evaluating whether an agency official's actions were rational, the "'disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.''" Impresa, 238 F.3d at 1333 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Courts have recognized that contracting officials may properly exercise wide discretion in

---

[7] Section 706(2) of the APA provides that, in reviewing the validity of agency action, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C § 706(2).

applying procurement regulations. See id. at 1332; Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985). The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 654 n. 8 (2002), aff'd, 56 Fed. Appx. 474 (Fed. Cir. 2003) (quotation omitted). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974). Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained. Id.

When a protestor asserts a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Impresa, 238 F.3d at 1333 (quoting Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). "[T]o establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract." Data Gen. Corp., 78 F.3d at 1563; see also Four Points By Sheraton v. United States, 63 Fed. Cl. 341 (2005).

"Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still where, as here, the procurement is a 'best-value' procurement." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); see also Rig Masters,

Inc. v. United States, 70 Fed. Cl. 413, 420 (2006). In a bid protest involving a "negotiated procurement," the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests. Galen Medical Associates, Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citation omitted). "The higher burden exists because the contracting officer engages in what is 'inherently a judgmental process." Id. (quotation omitted). "[T]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious." Id. (citation omitted).

As the contract was to be awarded based on "best value," the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone. Galen, 369 F.3d at 1330; E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir.1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). "Where an evaluation is challenged, [the Court] will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." E.W. Bliss, 77 F.3d at 449 (quotation omitted). This Court defers to agencies "in matters of technical adequacy of proposals upon a showing that the agency's decision has a reasonable basis." Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 329 (2000) (citing Cube Corp. v. United States, 46 Fed. Cl. 368, 386 (2000)).

Pursuant to RCFC 52.1,[8] this Court reviews the agency's procurement decision to determine whether it is supported by the already-existing administrative record. The standards

---

[8] On June 20, 2006, based upon the Federal Circuit's decision in Bannum, Inc. v. U.S., 404 F.3d 1346 (Fed. Cir. 2005), RCFC 52.1 replaced RCFC 56.1 to avoid any confusion with the standards applicable to summary judgment.

applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); Lion Raisins, Inc. v. United States, 51 Fed. Cl. 238, 246-47 (2001); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (explaining basis for summary judgment on the administrative record). Unlike a Rule 56 motion, "proceeding under RCFC [52.1] merely restricts the evidence to the agency record . . . ." Bannum, 404 F.3d at 1356. "Thus, the central inquiry on a motion for summary judgment -- whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment -- has no bearing on a review of the administrative record . . . ." Tech Systems, 50 Fed. Cl. at 22; accord Bannum, 404 F.3d at 1356 (holding that RCFC [52.1] requires a different standard of review without the burden-shifting and presumptions required pursuant to RCFC 56).

B. The Air Force Has Not Acted Arbitrarily Or Capriciously And Has Not Violated Any Applicable Procurement Statute Or Regulation

1. The Air Force Did Not Disqualify DynCorp Or Establish A Competitive Range

In its motion for judgment upon the administrative record, DynCorp states multiple times that the Air Force created a competitive range of one and disqualified DynCorp from the competition. Pl. Mot. at 20-23. DynCorp is incorrect in both statements because a competitive range was not established for the CAM acquisition, AR 745-46, 783, nor was DynCorp's proposal ever disqualified. Even though DynCorp's proposal [*****], its proposal was evaluated fully on all technical factors, proposal risk, past performance, and price/cost. AR 792-808. AFFARS § 5315.305 states that a proposal may not be awardable if it receives a

Red/Unacceptable rating as a result of a deficiency. AR 800. However, the Air Force would only have considered disqualifying DynCorp if it had established a competitive range.

There is no dispute that when the Government "establishes a competitive range of one offeror, the decision is subject to close scrutiny." Bean Stuyvesant, 48 Fed. Cl. at 320 (citations omitted). However, the Government is only required to establish a competitive range when it plans to conduct discussions. See FAR § 15.306(b)-(d), 48 C.F.R. § 15.306(b)-(d). In Firearms Training Systems, Inc. v. United States, 41 Fed. Cl. 743 (1998), this Court noted that:

> FAR 15.306 provides the contracting officer with a series of options for securing additional information from offerors prior to contract award and contemplates that the government will establish a competitive range in those instances where it intends to engage in "discussions" with an offeror during which the offeror will be afforded an opportunity to revise its proposal.

41 Fed. Cl. at 746. As noted above, offerors for the CAM acquisition were provided with clear notice that the Air Force did not plan to conduct discussions after the receipt of initial proposals. AR 151, 173-74, 597. Accordingly, only clarifications would be issued after the submission of proposals. FAR § 15.306(a) defines clarifications:

> (a) Clarifications and award without discussions.
> (1) Clarifications are limited exchanges between the Government and offerors, that may occur when award without discussions is contemplated.
> (2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.
> (3) Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions. If the solicitation contains such a notice and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract
> file . . . .

Most notable in the above definition is that "FAR 15.306(a) anticipates that where, as here, the solicitation reflects an intent to make an award without discussions, the contracting officer will make a competitive range determination only if the contracting officer later determines that commencing such discussions and allowing proposal revisions would be efficient." Firearms Training, 41 Fed. Cl. at 747-48 (emphasis added).

In this case, the administrative record unambiguously demonstrates that the SSET and SSA determined that the Air Force would make the award without discussions, and the SSA decided not to allow offers to revise their proposals or enter into "discussions" under FAR § 15.306(d). AR 783. Consistent with this position, the Air Force did not at any time document in the record any rationale for abandoning its prior intent to evaluate the proposals without discussions, as would have been required under FAR § 15.306(a)(3). See also Firearms Training, 41 Fed. Cl. at 746.

Because a competitive range was not established, DynCorp's proposal was never disqualified from the acquisition. FAR § 15.306(c) defines "competitive range" as follows:

> (c) Competitive range.
> (1) Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range. Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all the most highly rated proposals . . . .
> (3) If the contracting officer, after complying with paragraph (d)(3) of this section, decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award. Written notice of this decision shall be provided to unsuccessful offerors in accordance with 15.503.

FAR § 15.306(c) (emphasis added).

In this case, because a competitive range was never established, DynCorp's proposal was never disqualified. It was evaluated fully on every factor set forth in the RFP. Following this thorough evaluation, the SSA made the decision to award the contract to M1 because of M1's superior ratings and the low probability that discussions would result in DynCorp's ratings exceeding those of M1. AR 807-08. Accordingly, any argument by DynCorp that the Air Force improperly disqualified it from award or established a competitive range of one is inapposite.

2. The Air Force Did Not Conduct Illegal Discussions With M1

DynCorp also argues that the Air Force conducted illegal discussions with M1. Pl. Mot. at 30-32. Although the ENs that were sent to M1 were labeled as clarifications, DynCorp argues that from the face of these ENs, it is evident that they address "key substantive issues in the M1 proposal" and gave "M1 the opportunity to revise its proposal in significant ways and to correct material deficiencies." Pl. Mot. at 30. Contrary to DynCorp's assertions, all ENs issued to M1 were issued for clerical purposes or to correct minor or clerical errors in its proposal, and M1's responses did not revise its proposal in anyway or impact the evaluation results.

The ability of the agency to conduct "discussions" is governed by both statute and regulation. Under 41 U.S.C. § 253b(d) and 10 U.S.C. § 2305(b)(4)(A), an agency may award a contract "after discussions with the offerors" or "based on proposals received and without discussions with the offerors." 41 U.S.C. § 253b(d); 10 U.S.C. § 2305(b)(4)(A). If the agency decides to hold discussions, as noted above, it first must establish a competitive range comprised of the mostly highly rated proposals. FAR § 15.306(c)(1). In order to determine the competitive range, the agency may engage in "communications" with the offerors, which are defined as "exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range." FAR § 15.306(b).

If the agency decides to award the contract after holding discussions, it must hold discussions with all offerors within the competitive range. 41 U.S.C. § 253b(d)(1)(A); 10 U.S.C. § 2305(b)(4)(A)(i). However, the agency may hold "discussions conducted for the purpose of minor clarification" with one or more offerors. Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1318 (Fed. Cir. 2003) (citing 41 U.S.C. § 253b(d)(1)(B), 10 U.S.C. § 2305(b)(4)(A)(ii)).

Under FAR § 15.306, "clarifications" are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." Info. Tech., 316 F.3d at 1321. Clarifications permit an offeror to clarify certain aspects of its proposal or to resolve minor or clerical errors. FAR § 15.306(a)(2). In contrast, "discussions" involve "negotiations" between the Government and offerors, which, in a competitive procurement, take place after the establishment of a competitive range. See FAR § 15.306(d).

> Because discussions involve negotiations, they may include "bargaining," which "includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract." And unlike clarifications, discussions "are undertaken with the intent of allow the offeror to revise its proposal." Also unlike clarifications, discussions take place after the government has established a "competitive range" of the most highly rated proposals. Discussions need only be held with each offer within the competitive range.

Info. Tech., 316 F.3d at 1321 (quoting FAR § 15.306(d), citing FAR § 15.306(c)). Exchanges of information which lead to the correction of a mathematical error fall "squarely within the definition of 'clarification' rather than 'discussion.'" Galen Med. Assocs., 369 F.3d at 1333. A clerical or mathematical error is a "quintessential example of a clarification." Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 162 (2005) (citations omitted).

DynCorp alleges that the Air Force allowed M1 the opportunity to make significant proposal revisions without affording DynCorp the same opportunity. Pl. Mot. at 31. Because the Air Force's rationale for sending the clarification ENs to M1 is not adequately explained in the administrative record, the attached declaration from Contracting Officer Jacquelyn Cooper explains the reasons for why the ENs were sent to M1. As demonstrated below, all ENs were sent for clarification purposes or to resolve minor or clerical errors.

a. EN Regarding [*****]

In one EN, M1 was asked to clarify [*****] (AR 1363-64) [*****]. AR 655. M1 confirmed that [*****]. Id. Its response was deemed acceptable by the technical team. Id. The Air Force was only seeking confirmation [*****]. Cooper Decl. ¶ 3. Its confirmation had no effect on the evaluation of its proposals. Id.

b. EN Regarding [*****]

In another EN, M1was asked [*****]. AR 1333. The technical team wanted to see [*****]. Cooper Decl. ¶ 3. M1's response [*****], and its response was deemed acceptable by the technical team. AR 657-68. M1's response did not revise its proposal, nor did it have an effect on the evaluation of its proposal. Cooper Decl. ¶ 3.

c. EN Regarding [*****]

In another EN, M1 was asked [*****]. AR 660. The Air Force needed to determine this because it was not sure it could get approval [*****]. Cooper Decl. ¶ 3. M1's response provided that [*****]. AR 660. Its response was deemed acceptable by the technical team. AR 661. M1 did not revise its proposal with this response, nor did it have an effect on the evaluation of its proposal. Coopler Decl. ¶ 3.

d. EN Regarding [*****]

In another EN, M1 was asked [*****]. AR 662. [*****]. Id. M1's response [*****]. AR 662. It did not revise [*****], and the revision did not result in a change in M1's total evaluated price. Cooper Decl. ¶ 3. Its response was deemed acceptable by the technical team. AR 662.

e. EN Regarding [*****]

The solicitation asked offerors to provide a DCMA-Approved Purchasing System, if applicable. AR 161. [*****] AR 663. This response was deemed acceptable by the contracting officer. AR 664. The document had no effect on the evaluation of proposals because the solicitation did not state [*****]. Cooper Decl. ¶ 3. The EN simply allowed M1 to provide additional information to be used in the Air Force's general assessment of M1's responsibility. Id.

f. EN Regarding [*****]

The solicitation asked offerors to provide the most recent financial statements that are available. AR 161. [*****]. M1's response was accepted by the contracting officer. AR 665. [*****]. Cooper Decl. ¶ 3. The solicitation did not state that [*****] would be evaluated. Id. Therefore, the documentation requested had no effect on the evaluation of proposals. Id.

As demonstrated above, the Air Force only issued ENs to M1 to clarify certain aspects of its proposals or to resolve minor or clerical errors. Most notably, there were no discussions between the Air Force and M1. There were no negotiations or bargaining. Cf. FAR § 15.306(d). The Air Force only found that M1's responses were "acceptable." The ENs did not permit M1 to revise its proposal. Accordingly, the ENs issued to M1 fell within the realm of clarifications, and

the Air Force did not violate any law or regulation by only sending clarification ENs to M1.

3. The Air Force Was Not Required To Conduct Discussions With DynCorp

DynCorp also argues that the Air Force should have conducted discussions with DynCorp [*****]. Pl. Mot. at 26-28. DynCorp contends that it would have been easy to correct this [*****] and in fact, notes that the SSET even drafted two ENs for submission to DynCorp as the basis for discussions. Pl. Mot. at 26 (citing AR 2725-26).[9] In support of this argument, DynCorp relies upon the Government Accountability Office's ("GAO") decision in Falcon Systems, Inc., Comp. Gen. Dec. B-213,661, 84-1 CPD ¶ 658, 1984 WL 46220 (June 22, 2004).

In Falcon Systems, the GAO found that where only one firm remained in the competitive range, the agency should keep an "informationally deficient proposal in the competitive range unless further discussions based upon the proposal would have been truly meaningless." 1984 WL 46220, at *5. This case was decided well before the revision of Part 15 in 1997. See Info. Tech., 316 F.3d at 1321 (explaining the differences between the preexisting regulations and the 1997 amendments). Additionally, the case is inapposite to the CAM acquisition because there was no competitive range established. See AR 783.

"There is no requirement that an agency hold discussions where the solicitation advises offerors of the possibility of award without discussions." Carlson Wagonlit Travel, Comp. Gen.

---

[9] We continue to object to the inclusion of the draft evaluation notices in the administrative record. They are not relevant because any draft evaluation notices, that were never sent to the offerors, were not before the SSA when it made the award decision. The primary focus of this Court's review of the administrative record are the materials that were before the agency when it made its final decision. Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) (citation omitted). The two draft ENs referenced above were drafted by the technical evaluation team in case the SSA did not accept the SSET's award recommendation, and ordered the establishment of a competitive range and for discussions to be conducted with both offerors. See AR 735. However, the SSA decided to make the award to M1 without discussions and without establishing a competitive range. AR 783. Therefore, the fact that such drafts exist is not relevant to the award decision.

Dec. B-287,016, 2001 CPD ¶ 49, 2001 WL 254317, at *7 (Mar. 6, 2001); see also Omega World Travel, Comp. Gen. Dec. B-283,218, 2002 CPD ¶ 5, 1999 WL 33456229, at *4 (Oct. 22, 1999) ("There generally is no obligation that a contracting agency conduct discussions where the RFP specifically instructs offerors of the agency's intent to award a contract on the basis of initial proposals."). The contracting officer's discretion in deciding not to hold discussions is quite broad. Omega, 1999 WL 33456229, at *5.

Where a solicitation warns that an offeror might not have the opportunity to correct deficiencies in its proposal, there is no requirement that an agency conduct discussions with an offeror concerning deficiencies in its proposal. See JWK Int'l, 52 Fed. Cl. at 662-63. When one offeror has submitted an initial proposal that is technically acceptable and its offered price is fair and reasonable, an agency may make an award without discussions. Omega, 1999 WL 33456229, at * 5. Bald assertions that discussions "could have significantly changed" the outcome are not sufficient. Rig Masters, 70 Fed. Cl. at 422. As will be discussed below, the record does not demonstrate that DynCorp would have been awarded the contract if the Air Force had conducted discussions. See id.

Accordingly, the Air Force was not required to hold discussions with DynCorp. The solicitation clearly stated that the award would be made without discussions. AR 151, 173. M1 submitted a proposal [*****].

### C. The Air Force Made A Proper "Best Value" Determination In Making The Award To M1

#### 1. DynCorp's Disagreement With The Air Force's Evaluation Of The Proposals Is Not Sufficient To Show The Evaluation Was Unreasonable

DynCorp disagrees with the Air Force' evaluation of its proposal. First, it contends that the solicitation provided no guidance regarding a description of the MIS training process. Pl. Mot. at 23-24. Second, it contends that its proposal contained [*****]. Id. at 24-26.

Regarding the first issue, it is unclear whether DynCorp is challenging the terms of the solicitation, or whether it is challenging the Air Force's evaluation of a [*****]. If DynCorp is challenging the terms of the solicitation, its challenge is clearly untimely. See Novell, Inc. v. United States, 46 Fed. Cl. 601, 615 (2000) ("Offerors may challenge the terms of the solicitation, but only prior to submission of final proposals."); DSD Labs., Inc. v. United States, 46 Fed. Cl. 467, 479 (2000) (noting that the bidder had a duty to inquire regarding an ambiguous term in the solicitation prior to submission of final bids); Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 358, aff'd, 39 F.3d 1198 (Fed. Cir. 1994) ("If an offeror recognizes an ambiguity or other problem in the solicitation, proper procedure dictates that the offeror challenge the problem before submission of an offer."). Furthermore, the solicitation advised offerors that "clarification of government requirements should be requested by the offeror by submitting questions and/or recommended changes prior to the pre-proposal conference." AR 155. DynCorp never requested clarification or more information about [*****] requirement. In any event, the solicitation clearly stated that the Air Force would be evaluating whether proposals demonstrated [*****]. AR 175 (Section M, ¶ [*****]); see also AR 157 (Section L, ¶ [*****]). [*****]. AR 800. [*****]. Id. In a declaration attached to this brief, Technical Sergeant Beverly Tuttle, chairperson of the technical team, explains that [*****]. Tuttle Decl. ¶ 4. The technical team reached a unanimous consensus that [*****]. Id.

Although DynCorp contends that its proposal [*****]. The technical evaluation team did not find that [*****]. AR 800; Tuttle Decl. ¶ 4. Moreover, the declaration attached to

DynCorp's motion for judgment upon the administrative record demonstrates that DynCorp's proposal [*****]. Mr. Stewart's declaration states [*****]. Stewart Decl. ¶¶ 6-10.[10]

DynCorp contends that [*****]. Pl. Mot. at 25-26 (citing AR 2572-73). However, these initial evaluation notices are not relevant to the Air Force's award decision. The initial evaluation notices were not considered by the SSA because the technical team reached a consensus decision on the technical evaluation of the proposals. AR 753; see also Tuttle Decl. ¶ 3 (noting that a unanimous team consensus was reached at each aspect and subfactor level). None of the evaluators dissented from the consensus decision. Tuttle Decl. ¶ 3. This Court reviews the consensus decision in order to determine whether the agency's evaluation had reasonable basis. As this Court has previously noted:

> Agency evaluators may meet to discuss the relative strengths and weaknesses of proposals, as was done here, in order to reach a consensus rating, which often differs from the ratings given by individual evaluators, since such discussions generally operate to correct mistakes or misperceptions that may have occurred in the initial evaluation. . . . The overriding concern in the evaluation process is that the final scores assigned reasonably reflect the actual merits of the proposals, and not that they be mechanically traceable back to the scores initially given by the individual evaluators.

Bean Stuyvesant, 48 Fed. Cl. at 326 (citations omitted); see also Omega, 1999 WL 33456229, at *3.

DynCorp's contention that the Air Force placed too much emphasis on [*****] or that the Air Force [*****], Pl. Mot. at 22-24, merely amounts to a disagreement with the Air Force's evaluation of its proposal. However, the evaluation of technical proposals is a matter within the discretion of the contracting agency because the agency is responsible for defining its needs and

---

[10] "Stewart Decl.__" refers to the declaration of Cameron R. Stewart, attached to plaintiff's motion for judgment upon the administrative record.

the best method of accommodating them. Carlson Wagonlit, 2001 WL 254312, at *2 (citation omitted). In reviewing an agency's evaluation, the Court examines the agency's evaluation to ensure that it was reasonable and consistent with the solicitation's stated evaluation criteria. Id. "The offeror has the burden of submitting an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequancy of the proposal is not sufficient to establish that the agency acted unreasonably." Id. (citing PEMCO World Air Servs., Comp. Gen. Dec. B-284,240.3, 2000 CPD ¶ 71, at 15 (Mar. 27, 2000)). An offeror's mere disagreement with the agency's overall assessment of the adequacy of its proposal falls short of meeting "the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." JWK Int'l, 52 Fed. Cl. at 660 (citations omitted).

It is well documented in the administrative record that [*****]. AR 761-62, 800. Mere disagreement with the Air Force's assessment is not sufficient to demonstrate that the Air Force acted unreasonably.

2. The Award To M1 Was Reasonable And Was Not "A Close Call"

DynCorp's motion seems to suggest that but for [*****], DynCorp would have been awarded the contract. However, the administrative record demonstrates that the award to M1 was not "a close call." In fact, M1's proposal [*****]. AR 795-804. Even if the Air Force had decided to conduct discussions to permit DynCorp to revise its proposal [*****], the record demonstrates that the award would have still gone to M1. To demonstrate prejudice, a protestor must identify specific facts tending to show that "there was a reasonable likelihood that the protestor would have been awarded the contract" but for the alleged error. Rig Masters, 70 Fed. Cl. at 422 (quoting Data Gen. Corp., 78 F.3d at 1562). Here, the record does not suggest that the

Air Force would have awarded the contract to DynCorp even if the Air Force had conducted discussions.

In fact, the SSA noted that one of the reasons it decided to make the award to M1 was the low probability that discussions would have resulted [*****]. AR 808. Because M1's technical proposal [*****] than DynCorp’s proposal, it is not likely that discussions would have resulted in an award to DynCorp. AR 795-804, 807.

Additionally, with a best value determination, the Air Force is permitted to make an award to the offeror who was not the lowest-priced offeror. DynCorp repeatedly emphasizes that its proposal [*****].[11] Pl. Mot. at 28-29. However, the Air Force found both price proposals [*****], and the Air Force also found that [*****]. AR 806-07. Because M1's proposal was found [*****] to DynCorp’s on the Mission Capability factor, and this factor was more important than the Price/Cost factor, AR 174, the Air Force reasonably decided to award the contract to M1.

3. M1's Proposal Was Eligible For Award

DynCorp also contends that M1 was not eligible for award because it failed to comply with a material term of the solicitation. Pl. Mot. at 33-34. DynCorp contends that M1 failed to comply with a material term of the solicitation [*****]. Id. at 33. However, DynCorp mislabels

[11] DynCorp also argues that a slide in the SSET’s presentation to the SSA, AR 735, demonstrates that the Air Force decided not to enter into discussions with the offerors because it calculated that the cost of discussions would be [*****]. Pl. Mot. at 29. DynCorp misinterprets this portion of the SSET’s presentation to the SSA. As the contracting officer explains in the attached declaration, the “cost” mentioned is not the “additional cost of establishing a competitive range” but is the amount of additional funds required to award the contract to DynCorp. Cooper Decl. ¶ 4. The [*****] indicated on the presentation slide is [*****] that exceeded the available funds at the time of briefing. Id.

this requirement as a material term of the solicitation, when in actuality, it was not a requirement for the award.

Section L of the solicitation sets forth the proposal instructions, and Section M of the solicitation sets forth the evaluation factors for award. AR 152, 173. Section M provides that "[o]fferors are required to meet all solicitation requirements such as terms and conditions, representations and certifications, and technical requirements in addition to those identified as factors, subfactors, or aspects to be eligible for award." AR 173 (¶ M-1.4). The portion of section M quoted by plaintiff– "the offeror's proposal will be reviewed for compliance with the requirements specified in Section L of the solicitation," Pl. Mot. at 33 (citing AR 178, ¶ M-7.2, AR 717), refers to assessing an offeror's price reasonableness. In contrast, the Air Force's request that offerors provide documentation of a DCMA-approved purchasing system is labeled as a request for "information other than cost or pricing data." AR 161, ¶ L-10.3. None of the documents located under this subsection are listed as evaluation criteria for the contract award. See AR 178-79. Accordingly, whether an offeror provided documentation of a DCMA-approved purchasing system was not evaluated by the Air Force when it made its award decision. A DCMA-approved purchasing system was not a material requirement for award. Furthermore, even if it was a material requirement for award, the solicitation does not require that M1 be automatically eliminated. The solicitation states that the "[f]ailure to include all information requested may adversely affect the evaluation and may result in a determination that the proposal is non-responsive." AR 154 (¶ L-6.1) (emphasis added).

More importantly, the purchasing system requirement does not even apply to M1, because it is tied to offerors' Cost Accounting Standards ("CAS") disclosure statements, which the solicitation only required to be submitted, if applicable. DynCorp has only selectively quoted

from the paragraph in the solicitation requesting that offerors provide documentation of a DCMA-approved purchasing system. The full language of that paragraph is provided below:

> The offeror shall identify the cognizant Defense Contract Audit Agency (DCAA) field office that has oversight of the offeror's organization. Since portion of the contract requirements will be included on a cost-reimbursable basis, provide a copy of your disclosure statement with the proposal as well as identification of compliance with Cost Accounting Standards (CAS), if applicable, and any CAS violations and subsequent corrections. Additionally, provide documentation of a Defense Contract Management Agency (DCMA)-approved purchasing system which is in compliance with your disclosure statement.

AR 161 (¶ L-10.3.1) (emphasis added). The underlined language above demonstrates that the Air Force contemplated that offerors might not have CAS disclosure statements, and the requirement to submit documentation of an approved purchasing system was directly tied to the existence of a CAS disclosure statement. Some Government contractors are not required to have disclosure statements. In fact, contracts with small businesses are exempt from CAS requirements. See 48 C.F.R. § 9903.201-1(b)(3). As stated above, M1 is a HUBZone small business concern. AR 757. As M1 noted in its response to the Air Force's evaluation notice,

> [*****]

AR 663. The contracting officer found this response to be acceptable. AR 664. Because the existence of a DCMA-approved purchasing system was not a material requirement of the contract, and was not even listed as an evaluation criteria in the solicitation, DynCorp's argument that M1 was ineligible for award [*****] is without merit.

## II. DynCorp Has Failed To Establish That It Is Entitled To An Injunction

### A. Standard For Obtaining Injunctive Relief

"If a plaintiff demonstrates that a procurement was unlawful, the issue then before the Court is whether to grant permanent injunctive relief." Bean Stuyvesant, 48 Fed. Cl. at 320. In

order to obtain a permanent injunction, a plaintiff must establish: (1) actual success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. Id. at 320-21 (citing Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000)) (additional citation omitted).

B. Success On The Merits

As demonstrated above, DynCorp has not shown that the Air Force's award of the CAM contract to M1 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. In fact, the award to M1 without discussions had both a rational basis and was in accordance with all applicable statues and regulations. DynCorp has not met its heavy burden of showing that the award decision had no rational basis. See Rig Masters, 70 Fed. Cl. at 420 (quoting Impresa Construzioni, 238 F.3d at 1333). Accordingly, DynCorp is not entitled to a permanent injunction because it failed to demonstrate success on the merits.

C. Irreparable Harm

Additionally, DynCorp has failed to demonstrate that it will suffer irreparable harm due to the loss of the CAM acquisition. DynCorp contends that it will suffer a loss of profits and a loss of business opportunities as a result of the award to M1. However, neither of these collateral effects amount to irreparable harm.

> "Economic loss does not, in and of itself, constituted irreparable harm." . . . Only economic loss that threatens the survival of a movant's business constitutes irreparable harm. . . . The plaintiffs do not claim that they will be destroyed if they do not obtain an injunction. Rather, they merely claim that they risk losing a valuable contract and some of their employees. This is insufficient.

Foundation Health Fed'l Servs. v. United States, 1993 WL 738426 (D.D.C. 1993) (quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir.1985)) (additional citation omitted); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm, without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

The loss of the CAM acquisition does not appear to threaten the survival of DynCorp's business. In fact, the evidence in the record suggests that DynCorp is a successful, and well-regarded contractor for multiple Government contracts. AR 2285-2296, 2310-2323. Loss of profits, a loss of staff, and a loss of business opportunities are the same claims that can be advanced by every single disappointed bidder for a Government contract every time a competitor gets a contract award; however, that does not rise to the level of irreparable harm. Therefore, DynCorp has not shown that it will suffer irreparable harm if a permanent injunction is not issued.

D. Balance Of Harms And Public Interest

The services that are provided in the CAM contract are essential aircraft maintenance services for the Air Force. AR 743-44. There cannot be a break in these services or lives would be at stake. Therefore, should this Court issue a permanent injunction, the Air Force would be forced to enter into a sole source contract with DynCorp, whose current contract expires on March 31, 2007, until corrective action could be taken, in order to continue to provide these essential services to the Air Force. DynCorp will no longer be bound by the contract terms of the incumbent contract, and the Air Force could be forced to agree to less favorable terms because it would not have any other options. Therefore, it is in the public interest for the Court not to issue

a permanent injunction. The Court should allow the Air Force to proceed with a contract award where the [*****].

CONCLUSION

For these reasons, we respectfully request the Court to grant defendant's motion for judgment upon the administrative record, deny plaintiff's cross-motion and request for injunctive relief, and dismiss plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/Todd M. Hughes
TODD M. HUGHES
Assistant Director

s/ Dawn S. Conrad
DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2279
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

MAJOR CHRISTOPHER M. SCHUMANN
Commercial Litigation Division
Air Force Legal Operations Agency
1501 Wilson Blvd., Suite 604
Arlington, VA 22209-2403

electronically filed
February 26, 2007

CERTIFICATE OF FILING

I hereby certify that on this 21st day of March, 2007, a copy of the foregoing "AGREED-UPON REDACTED COPY OF DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" and two attached declarations were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Dawn S. Conrad