# In the United States Court of Federal Claims

No. 07-84 C
(Filed May 24, 2007)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * | * | |
| DYNCORP INTERNATIONAL LLC, | * | Post-Award Bid Protest; |
| | * | Contracting by Negotiation; 48 |
| *Plaintiff,* | * | C.F.R. § 15.306 (2006); |
| | * | Deference to Agency's |
| v. | * | Technical Evaluation of |
| | * | Proposals; Award without |
| THE UNITED STATES, | * | Discussions; Clarifications |
| | * | versus Discussions; Materiality |
| *Defendant,* | * | of Proposal Omissions; |
| | * | Responsibility versus |
| M1 SUPPORT SERVICES LP, | * | Responsiveness; Elimination of |
| | * | Proposal Innovation from |
| *Intervenor-defendant.* | * | Awarded Contract. |
| * * * * * * * * * * * * * * * * * | * | |

*George D. Ruttinger*, Washington, D.C., for plaintiff. *John E. McCarthy, Jr.* and *Charlotte E. Gillingham*, Washington, D.C., of counsel.

*Dawn S. Conrad*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Todd M. Hughes*, Assistant Director, Washington, D.C., for defendant. *Major Christopher M. Schumann*, Air Force Legal Operations Agency, Arlington, VA, of counsel.

*Philip J. Davis*, Washington, D.C., for intervenor-defendant. *William A. Roberts, III*, *Richard B. O'Keeffe, Jr.*, and *Jon W. Burd*, Washington, D.C., of counsel.

---

[1]/ This opinion was issued under seal on March 15, 2007. Pursuant to ¶ 3 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Italicized brackets (*[]*) identify the material deleted. At the request of plaintiff, the court also changed the shorthand reference to the protestor to "DI."

## OPINION

**Bush**, *Judge*

DynCorp International LLC (DI) filed its post-award bid protest on February 2, 2007. DI seeks declaratory and injunctive relief voiding the award of a contract to M1 Support Services LP (M1) for "aircraft maintenance services for the T-38 aircraft at Beale, Holloman and Whiteman Air Force Bases." Compl. at 1. M1 intervened, and the parties have complied with an expedited briefing schedule in order to resolve this protest on the merits before M1 is scheduled to take over the contested aircraft maintenance responsibilities from DI, the incumbent contractor, on April 1, 2007. The administrative record (AR), the parties' briefing on cross-motions for judgment on the administrative record and the transcript of oral argument held March 8, 2007 are before the court. For the reasons discussed below, DI's protest is denied.

## BACKGROUND

### I. The Solicitation

"T-38 aircraft serve as trainer aircraft for pilots of fighter and bomber aircraft located at Beale, Holloman and Whiteman" Air Forces Bases in California, New Mexico and Missouri, respectively. AR at 64; Pl.'s Mot. at 3. The United States Department of the Air Force (Air Force) issued Solicitation FA4890-06-R-0165 (the solicitation) on July 3, 2006 seeking proposals for maintenance services for the T-38 aircraft at these three bases. AR at 66, 188. DI is the incumbent contractor providing these services, through March 31, 2007. *Id.* at 19.

The solicitation is for a fixed-price contract with award fee and cost-reimbursable line items. AR at 810. The new contract encompassed a transition period, a base period, and four option years, potentially running through September 30, 2011. *Id.* at 135. Only two bidders, DI and M1, responded to the solicitation by the closing date. *Id.* at 745, 792.

The solicitation was clearly marked as a negotiated procurement. AR at 66. Award would go to the responsible bidder whose proposal "conform[ed] to the solicitation[']s requirements, and [wa]s judged, by an integrated assessment of the proposal based on evaluation criteria to represent the best value to the Government." *Id.* at 173. This type of procurement is governed by Part 15 of the Federal Acquisition Regulation (FAR), 48 C.F.R. §§ 15.000-15.609 (2006)[2] and several provisions of FAR Part 15 were cited in the solicitation sections discussing proposal preparation and evaluation criteria. *See* AR at 151, 153, 158, 172-73, 178.

The Air Force stated that it "intend[ed] to award without discussions." AR at 173. Bidders were "advised to submit initial proposals that are fully and clearly acceptable without the need for submission of additional information." *Id.* However, the Air Force also reserved the right to hold discussions and negotiations in order to solicit revised proposals, if revisions were "in the best interest of the Government." *Id.* at 174.

## II. Evaluation Criteria and the Rating of Proposals

### A. Overview of the Rating System

The rating system for proposals in this best value procurement was not, in the court's view, particularly susceptible to quantification. Rather, the Air Force employed a system of weighted factors and subfactors. *See* AR at 174-79; *see also id.* at 746 (describing the source selection as based on "an integrated assessment of the evaluation factors and sub-factors"). The evaluators admitted that "the source selection process by nature is subjective," but stated that "proposals were evaluated based solely on the criteria contained in the solicitation." *Id.* at 746. The solicitation announced that four factors of uneven weight would be used in the evaluation of proposals: "(1) Mission Capability, (2) Proposal Risk, (3) Past Performance, and (4) Price/Cost." *Id.* at 174.

The evaluation of Mission Capability rated the "[o]fferor's capability to

---

[2]/ The current version of FAR Part 15 appears to be identical, in all pertinent respects, to the 2005 version. Thus, even if some of the actions of the government subject to review here were undertaken before October 1, 2006, the court will cite only to the 2006 version of FAR Part 15.

satisfy the government's requirements with technical, performance, or capability requirements being addressed." AR at 746. For the subfactors within Mission Capability, the "subfactor ratings [would identify and] focus on the strengths, weaknesses, uncertainties, and deficiencies of the offeror's proposal." *Id.* at 174. The bidder was warned that subfactor ratings within Mission Capability would not be averaged to produce an overall rating for Mission Capability. *Id.*

The court discusses below, in some detail, the rating of DI's and M1's proposals, but first makes an observation concerning the rating system applied to Mission Capability, the factor which turned out to be the crucial evaluation factor in this competition. The subfactors within Mission Capability, with their descriptive subparts, provided each offeror with a list of important proposal requirements. *See* AR at 174-76. Comparing each proposal to that list, the Air Force could identify any significant omissions in a proposal. The Air Force could also identify any significantly weak proposal components that did not sufficiently comply with listed requirements. Finally, the Air Force could identify exceptionally strong components that met and exceeded performance goals described on the list. In this particular competition with only two offerors, the Air Force was able to decide, based on how the two proposals fared when checked against the list of required components in Mission Capability, which was the better proposal in terms of service delivery.

## B. Significant Rating Results for DI and M1

As stated above, there were four factors of uneven weight in the evaluation of proposals. These were: "(1) Mission Capability, (2) Proposal Risk, (3) Past Performance, and (4) Price/Cost." AR at 174. Mission Capability and Past Performance were weighted the same, with Proposal Risk less important than either of those. *Id.* Price/Cost was less important than the other three factors. *Id.* ("All three (3) factors are more important than the Price/Cost factor."). Because the Air Force rated Past Performance for DI and M1 as "essentially equal" and gave them both a significant confidence rating, *id.* at 804a, the court will not discuss that factor further.

### 1. Mission Capability

There were three subfactors within Mission Capability: Program

Management, Operations and Maintenance, and Transition/Phase-In. AR at 174. Program Management and Operations and Maintenance were of equal weight, while Transition/Phase-In was less important. *Id.* The subfactor titles, such as "Operations and Maintenance," do not appear to be defined as terms of art in the solicitation, but instead are defined by the subparts within each subfactor, which describe specific performance tasks and capabilities. *See id.* at 155-57, 175-76. The court will address each of Mission Capability's subfactors in turn.

**a. Program Management**

The Program Management subfactor was composed of three subparts: Management and Integration, Human Resources, and Quality Management System. AR at 175. Neither M1 nor DI was rated as having any uncertainties, weaknesses or deficiencies in Program Management. *Id.* at 761, 770, 799. DI had three strengths and M1 had seven strengths in Program Management. *Id.* at 760-61, 767-69, 796-99. Although the Air Force evaluators stated that "[f]or the Program Management sub-factor, the Technical Team determined that M1[] has significantly stronger approaches," *id.* at 777, both DI and M1 received an Exceptional rating for this subfactor, and the Source Selection Decision Document (SSDD) reported that the two proposals "are equal for this sub-factor," *id.* at 799, 804.

**b. Operations and Maintenance**

The Operations and Maintenance subfactor comprised four subparts: Maintenance Management Program, Off-Station and Operating Location Aircraft Recoveries/Repairs, Approach to Improve Aircraft Phase Inspection Turnaround Time (TAT), and Maintenance Information System (MIS) Data Integrity. AR at 157, 175. M1 earned four strengths in this subfactor, two of which were in the TAT subpart, its approach to reducing time spent on aircraft phase inspections. *Id.* at 770-71, 801-02. M1 received no uncertainties, weaknesses or deficiencies in the Operations and Maintenance subfactor. *Id.* at 771, 802. M1 was rated Exceptional for Operations and Maintenance. *Id.* at 770, 804.

DI, however, had only one strength in Operations and Maintenance, in the Off-Station and Operating Location Aircraft Recoveries/Repairs subpart. AR at 761, 799-800. Although DI received no uncertainty ratings for Operations and

Maintenance, the evaluators gave DI two weaknesses and one deficiency for this subfactor. *Id.* at 761, 800-01. The TAT subpart had one weakness, and the MIS subpart had a deficiency and a weakness that were related to each other. *Id.* at 762, 800-01. The court will address each problem area in turn.

For DI's TAT approach, the evaluators stated that DI's

> proposed approach did not provide sufficient data integrity identifying specific areas of the phase process where initiatives will reduce steps, eliminate inefficiencies, and streamline processes to support a reduction of aircraft phase inspection turnaround time (TAT). The offeror provided general managerial actions to address the challenges of reducing TAT, but did not provide specific information on process improvements that would result in the reduction of TAT.

AR at 762. In other words, the evaluators were unconvinced that DI could achieve reductions in TAT with its proposal. *See id.* at 778 (stating that there was "insufficient data integrity in the proposal [to ensure] that its methodology for reducing phase turnaround time [TAT] would achieve the proposed reduction"). The SSDD echoed the evaluators' concern and similarly concluded that DI's TAT approach relied too much on "*[]*" and did not specifically point to "*[]*." *Id.* at 800. For these reasons, DI received one weakness and no strengths for its TAT approach, whereas M1 received two strengths and no weaknesses for its TAT approach. *Id.* at 799-802.

It was the MIS subpart, however, of the Operations and Maintenance subfactor of Mission Capability that produced the fatal deficiency rating for DI's proposal. The Maintenance Information System (MIS) Data Integrity requirement was described in two portions of the solicitation. First, bidders were instructed to

> [d]escribe your data integrity process to ensure aircraft maintenance data is accurate and complete. Identify any innovations/efficiencies for analyzing data that would result in qualitative improvements that are beneficial to the Government. Explain how this will support trend

> analysis and other uses of this data.

AR at 157. Second, offerors were notified of the evaluation criteria for the MIS Data Integrity subpart of Operations and Maintenance which:

> Demonstrates a comprehensive, effective, and logical MIS integrity program to ensure accurate and complete data within aircraft/equipment forms documentation and Core Automated Maintenance System (CAMS). Demonstrates a process of MIS training, data analysis, identification and correction of poor data integrity.

*Id.* at 175. Although DI cited to both of these solicitation sections in its proposal, the Air Force evaluators found a deficiency in DI's proposed "process of MIS training."

The evaluation team reported that DI's

> proposal failed to demonstrate a process for MIS training. The offeror identified ways to monitor, review and correct data integrity; however, it failed to provide a process for MIS training. In the proposal, the importance of emphasis on data integrity *[]*. However, the offeror did not provide information regarding the MIS training process. This deficiency has an associated risk which is described as the . . . weakness listed below.

AR at 762. The team went on to describe the associated weakness as

> a flaw which increased the risk of unsuccessful contract performance. . . . It will likely cause significant disruption of schedule, increased cost, and/or degradation of performance. The potential degradation of aircraft data integrity could result in damage to equipment and/or injury or loss of life for pe

*Id.* Because of the deficiency in its proposed MIS training process, DI "failed to meet the specified minimum performance or capability requirements necessary for

performance," and earned an Unacceptable rating for the Operations and Maintenance subfactor. *Id.* at 778. The SSDD stated that DI's "proposal was unacceptable because it failed to meet a specified minimum performance requirement . . . [and thus DI was] ineligible to be awarded the contract." *Id.* at 804. The Air Force concluded that M1 "has a stronger Mission Capability proposal than the other offeror's Mission Capability proposal." *Id.* at 807.

**c. Transition/Phase-In**

The Transition/Phase-In subfactor targeted the offeror's "transition plan to establish required management processes resulting in continuity of mission support and contract performance . . . [including] resources and personnel for support of the contract." AR at 157. The evaluation criteria focused on the soundness of the plan for the efficient "phasing in [of] resources and trained/qualified personnel required to assume contract tasks and responsibilities at the start of the contract performance period." *Id.* at 176. Neither M1 nor DI was rated as having any uncertainties, weaknesses or deficiencies in Transition/Phase-In. *Id.* at 763, 772, 803. Both M1 and DI had one strength in this subfactor and both received Acceptable ratings for their transition plans. *Id.* at 763, 772, 802-04.

**2. Proposal Risk**

The Proposal Risk factor rating was based on the Mission Capability subfactors, and identified "risks and weaknesses associated with an offeror's proposed approach." AR at 176. "Risk is assessed at the subfactor level, and includes potential for disruption of schedule, increased cost, degradation of performance, and the need for increased Government oversight as well as the likelihood of unsuccessful contract performance." *Id.* Risk ratings could be either High, Moderate or Low. *Id.*

Both offerors here received Low risk ratings for two of their three Mission Capability subfactors, Program Management and Transition/Phase In. AR at 799, 803. M1 also received a Low risk rating in the Operations and Maintenance subfactor. *Id.* at 802. As summarized in the SSDD, "No uncertainties, deficiencies, or weaknesses for M1['s] proposal were identified. Therefore, a Low Proposal Risk rating is appropriate [for M1's Operations and Maintenance]." *Id.*

DI, however, received a High risk rating for Operations and Maintenance, because of one deficiency and two weaknesses, discussed *supra*. AR at 802. The Air Force evaluators stated that DI

> failed to demonstrate a process for MIS Data Integrity training. This resulted in the assignment of a RED/UNACCEPTABLE rating for this sub-factor. There is a weakness associated with this deficiency. The potential degradation of aircraft data integrity could result in damage to equipment and/or injury or loss of life for personnel. This weakness increased the risk of unsuccessful contractor performance to the extent that it is likely to cause significant degradation of performance that may remain unacceptable even with special contractor emphasis and close government monitoring. Therefore, D[ynCorp] was a[ss]essed a HIGH proposal risk rating for this sub-factor. D[ynCorp]'s proposal was determined to have a second weakness due to insufficient data integrity in the proposal that its methodology for reducing phase turnaround time [TAT] would achieve the proposed reduction. This weakness was a[ss]essed to justify a MODERATE risk rating because the presence of the weakness has the potential to cause disruption of schedule, increased cost, or degradation of performance and it pertains to a proposed reduction that is not a contract requirement. However, because of the HIGH risk assigned due to the [MIS training process] deficiency, the overall proposal risk rating for [DI's Operations and Maintenance] sub-factor is HIGH.

*Id.* at 778. As summarized in the SSDD, "based on the identification of one deficiency and two weaknesses, a HIGH Proposal Risk rating is justified for [DI's Operations and Maintenance]." *Id.* at 802.

### 3. Price/Cost

The solicitation incorporated a price evaluation preference for HUBZone

Small Business Concerns pursuant to FAR 52.219-4. AR at 141; *see* 48 C.F.R. § 52.219-4 (2005). M1 reported to the Air Force that it is a HUBZone small business. AR at 757, 1751. Because of this preference, a price offer from a non-HUBZone concern is evaluated at 110% of its proposed price, while the HUBZone small business concern's price is evaluated at 100% of its proposed price. *Id.* at 806.

DI's proposed price for contract performance, including the option years, was $*[]*. AR at 2046. However, because of the HUBZone price preference, DI's evaluated price was $*[]*. *Id.* at 806. M1's evaluated price was $41,827,924.[3] *Id.* Both evaluated prices were deemed to be "fair and reasonable" by the Air Force. *Id.* Because a best value procurement permits award to other than the lower-priced offeror, the difference of $*[]* in the evaluated prices of DI and M1 was not determinative of the "best overall value to the government." *Id.* at 807.

## III. Award

The Source Selection Authority (SSA) found that M1 provided the best value to the government for the T-38 maintenance services required by the solicitation, even though M1 was the higher-priced offeror. AR at 807. M1 had more strengths in its Mission Capability evaluation than DI, scored higher ratings for Operations and Maintenance than DI, received lower risk ratings than DI, was equal to DI in Past Performance, and had a fair and reasonable price. *See id.* at 808. Overall, the Air Force concluded that "the [source selection] decision is consistent with the evaluation methodology stated in Section M of the solicitation and the technical superiority and overall business approach of M1['s] proposal outweigh the relatively small price difference." *Id.* at 807.

During the source selection process, the Air Force considered holding discussions and negotiations with both offerors. AR at 735. The evaluation team recommended award to M1 without discussions, however. *Id.* at 734. The SSA concluded that there was a "low probability that discussions (allowing offerors to revise their proposals) would result in the other offeror's [DI's] ratings exceeding

[3]/ The proposed price for M1 was $*[]*. AR at 1506. The difference between M1's proposed price and its evaluated price is discussed *infra* in Analysis Section III(B)(4). In short, the Air Force corrected a calculation error and raised M1's proposed price by $*[]*.

those of M1." *Id.* at 808. The Air Force sent six evaluation notices (ENs) to M1 regarding its proposal and marked these exchanges as "clarifications." *Id.* at 783, 786-91. M1's responses to the ENs were received by the Air Force and judged adequate. *See* AR at 653-708.

The Air Force awarded contract number FA4890-07-C-0003 to M1 on December 21, 2006. AR at 859. DI requested a debriefing concerning the award a few days later. *Id.* at 1249-50. The debriefing was held on January 16, 2007. *Id.* at 1245. The contracting officer informed DI that its "proposal was a good proposal, but that the proposal of the other offeror was superior." *Id.* at 1246. DI filed a bid protest in this court on February 2, 2007.

## ANALYSIS

### I. Standard of Review

#### A. Judgment on the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

#### B. Bid Protest Review

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*). This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United*

*States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).[4] Standing is an element of this court's jurisdiction over bid protest cases. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder on the disputed contract and could not show prejudice, *i.e.*, that it had a substantial chance of receiving the contract but for the alleged procurement errors).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2000)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (*Banknote*) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (2000) (describing this court's standard of review for bid protests). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The higher the degree of discretion allotted the contracting officer, the more

---

[4]/ This first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"). The Federal Circuit has also stated that the two-step review of contract awards begins with a "without rational basis or contrary to law" review of an award and then proceeds to the issue of prejudice to the protestor. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief. *See Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing").

difficult it is for a protestor to prove that the procurement decision was arbitrary and capricious. *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1204 (Ct. Cl. 1974)). Negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protestor. *Id.* at 598 (citing *Keco*, 492 F.2d at 1204). Similarly, "best value" contract awards give a contracting officer more discretion than awards based on price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Thus, the protestor's burden is especially heavy in negotiated, best value procurements. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 380 (2003) (citations omitted), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation. "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449 (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)). "[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the bid process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a

substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## II. Standing

DI asserts that it has standing to bring this bid protest. Neither defendant nor M1 contests DI's standing. To prove that DI was prejudiced by this contract award for the purposes of establishing standing, DI must show that it had a "'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *ITAC*, 316 F.3d at 1319 (quoting *Alfa Laval*, 175 F.3d at 1367).

Here, DI was one of two offerors, and submitted a proposal that received strong ratings in all but the Operations and Maintenance subfactor. If discussions were held with both offerors and DI had a chance to remedy its Operations and Maintenance flaws, the record shows that DI would have been in the zone of active consideration for the T-38 maintenance contract and would have had a substantial chance of winning the contract. Thus, DI has standing to bring this protest. *Bannum*, 404 F.3d at 1353; *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1575 (Fed. Cir. 1983).

## III. Merits

Plaintiff presented three primary arguments in its opening brief, to support its request that the court invalidate the contract award to M1. A fourth argument was presented in plaintiff's reply brief. The court will discuss plaintiff's contentions, and the rebuttal arguments of defendant and intervenor, in some detail.

### A. Was DI's Proposal Given Proper Consideration by the Air Force?

Plaintiff's argument concerning the unfavorable treatment of DI's proposal can be described as one general, overarching thesis, with four buttressing points. Generally, plaintiff asserts that the Air Force's decision to award this contract without discussions deserves close scrutiny, and fails that scrutiny. Pl.'s Mot. at 22 (stating that the "award . . . to M1 without discussions cannot withstand close (or even cursory) scrutiny"). Plaintiff then proceeds to point out four alleged flaws

either in the evaluation process or the decision to award without discussions. The court will address each of plaintiff's contentions in turn.

### 1. Did the Air Force Have a Duty to Hold Clarifications or Discussions with Both Offerors in this Competition?

Assuming, at this point in the analysis, that none of the ENs sent to M1 by the Air Force constituted discussions allowing M1 to revise its proposal, a subject discussed *infra* in Analysis Section III(B), the court reviews the duty of the Air Force to enter into clarifications or discussions with the lower-rated of two offerors in a negotiated, best value procurement. First, it is important to note that the Air Force did not establish a competitive range of proposals in this procurement. AR at 745-46. According to FAR 15.306(c), "[a]gencies shall evaluate all proposals . . . , and, if discussions are to be conducted, establish the competitive range." 48 C.F.R. § 15.306(c). When an agency decides not to hold discussions, a competitive range is neither required nor permitted by FAR 15.306. *Id.*

Thus, the question here is not, as plaintiff contends in its opening brief, whether the Air Force properly established a competitive range of proposals. Pl.'s Mot. at 20-23. Rather, plaintiff must show either that the Air Force's technical evaluation of DI's and M1's proposals was flawed, or that the Air Force's decision not to hold clarifications and/or discussions with both offerors was flawed. These are related but distinct questions, and are best answered by examining the four specific errors that plaintiff has alleged in the evaluation process for this procurement.

### 2. Did the Solicitation Specify a Requirement for a Process of MIS Training so that a Process of MIS Training Deficiency Could Be Assigned to DI?

DI contends that the solicitation provided no guidance regarding the requirement for a "process of MIS training." Pl.'s Mot. at 23. According to plaintiff, "it can hardly be argued that the Air Force emphasized the importance of describing an MIS training process, or provided any guidance to offerors regarding what elements their proposals should address with respect to such a training process." *Id.* at 24. Plaintiff concludes that it was inappropriate to rate DI's proposal as having a fatal deficiency in MIS training under these circumstances.

*Id.* at 23 (stating that for "an offeror . . . to be disqualified from further participation in a competition, it should be based on failing to satisfy a clearly-stated requirement of the solicitation").

The seriousness of a deficiency rating cannot be overstated. According to the Air Force's rating system for Mission Capability, a proposal with one or more deficiency ratings fits into the Unacceptable category and is "not awardable." AR at 795 (citing Air Force Federal Acquisition Regulation Supplement (AFFARS) § 5315.3). The rating system reserves an Unacceptable rating for a proposal which "[f]ails to meet specified minimum performance or capability requirements." *Id.* If a process of MIS training was a specified minimum performance or capability requirement in the solicitation, the Air Force could properly give DI's proposal a deficiency rating in MIS training.

The court reads the solicitation to clearly specify a minimum performance requirement of "a process of MIS training." AR at 175. This requirement was listed in a section of the proposal titled "EVALUATION FACTORS FOR AWARD" and under a heading for the Operations and Maintenance subfactor warning that "[t]he offeror's proposal will be evaluated on the following." *Id.* at 173, 175. In comparing M1's and DI's proposal sections related to MIS training, it is clear that M1 discussed its process of MIS training as a separate performance requirement. *See id.* at 1388. For these reasons, plaintiff's argument that a process of MIS training was not emphasized in the solicitation, and that insufficient guidance was given concerning MIS training, fails.

### 3. Was DI's Proposal Properly Rated for its Process of MIS Training?

DI argues that its proposal did include an MIS training process, and that the adequacy of its MIS training was "a very close question." Pl.'s Mot. at 25. "This court defers to agencies in matters of technical adequacy of proposals upon a showing that the agency's decision has a reasonable basis." *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 329 (2000) (citing *Cube Corp. v. United States*, 46 Fed. Cl. 368, 386 (2000)). Here, although the court might have come to a different conclusion, the Air Force reasonably assigned a deficiency rating to DI for its proposed process of MIS Training.

According to the Air Force evaluators, DI

> failed to demonstrate a process for MIS training. The offeror identified ways to monitor, review and correct data integrity; however, it failed to provide a process for MIS training. *[]*. However, the offeror did not provide information regarding the MIS training process. This deficiency has an associated risk which is described as the . . . weakness listed below.

AR at 762. The evaluation team also found that

> [t]here is a weakness associated with this deficiency. The potential degradation of aircraft data integrity could result in damage to equipment and/or injury or loss of life for personnel. This weakness increased the risk of unsuccessful contractor performance to the extent that it is likely to cause significant degradation of performance that may remain unacceptable even with special contractor emphasis and close government monitoring.

*Id.* at 778. The court must defer to the Air Force's technical evaluation of DI's MIS training process, where it is squarely based on the evaluation criteria and rating system established by the solicitation. *See E.W. Bliss*, 77 F.3d at 449 (instructing courts not to second guess technical evaluations of procurement officials). Upon these facts and according deference to the Air Force, the court must conclude that the deficiency rating assigned to DI's proposal was proper.

### 4. If DI's Proposal Could Have Been Improved through Clarifications or Discussions, Was the Air Force Obliged to Hold Clarifications or Discussions with Both Offerors?

Discussions, as a term of art in negotiated procurements, are defined as "exchanges . . . between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal." 48 C.F.R. § 15.306(d). It is well-established that when offerors are on notice that award may be made without discussions, the government is not required, as a general rule, to hold discussions

before award. *E.g.*, *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 421 (2006) (citation omitted); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 662-63 (2002) (citation omitted); *HDL Research Lab, Inc.*, B-294959, 2005 CPD ¶ 8 (Comp. Gen. Dec. 21, 2004) (citation omitted); *see also* 48 C.F.R. § 15.306(a)(3) ("Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions."). The Government Accountability Office (GAO) has repeatedly stated that the government has broad discretion in its decision whether or not to hold discussions, and that review of that decision is "only to ensure that it was reasonable based on the particular circumstances of the procurement." *E.g.*, *HDL Research Lab, Inc.*, B-294959, 2005 CPD ¶ 8 (citation omitted). The GAO has also decided that "an agency is not precluded from awarding on an initial proposal basis merely because an unacceptable lower offer could be made acceptable through discussions." *Century Elevator Inc.*, B-283822, 99-2 CPD ¶ 112 (Comp. Gen. Dec. 20, 1999) (citation omitted). With these principles in mind, the court turns to the Air Force's conduct of this procurement.

Here, DI was on notice that the Air Force intended to award without discussions. AR at 173. Based on the evaluation criteria and ratings received by both offerors' proposals, the Air Force decided that discussions were not warranted, because discussions were unlikely to change the best value determination that M1's proposal was superior. *Id.* at 808. The court defers to the Air Force's discretion whether or not to hold discussions with M1 and DI, because that decision does not seem unreasonable, in light of the many evaluated strengths of M1's proposal. The Air Force's decision not to hold discussions, even here where only two proposals were received, was within the discretion afforded a procuring agency.

Clarifications, as a term of art in negotiated procurements, are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated[, in which case] offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." 48 C.F.R. § 15.306(a). FAR 15.306(a) thus describes the decision to engage in clarifications as discretionary. *See id.*; *see also Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 361 (2004) ("Nor does the FAR ever require

clarifications to be requested by agency officials.”) (citing 48 C.F.R. § 15.306(a)). Plaintiff argues that it is unfair to hold clarifications with one offeror and not the other. Pl.’s Reply at 20-22. In support of this contention, plaintiff cites numerous FAR provisions which demand impartiality, fairness, equitable treatment, consistency and lack of favoritism in procurement processes. *Id.* at 21 (citing 48 C.F.R. §§ 1.602-2(b), 15.303(b)(3), 15.306(e)(1)). However, the court notes that another FAR provision, FAR 1.102-2(c)(3), states that:

> The Government shall exercise discretion, use sound business judgment, and comply with applicable laws and regulations in dealing with contractors and prospective contractors. All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.

48 C.F.R. § 1.102-2(c)(3) (2006).

Upon review of the relevant FAR provisions, the court concludes that a procuring agency has the discretion to decline to enter into clarifications with an offeror, even if the agency has engaged in clarifications with another offeror. 48 C.F.R. §§ 1.102-2(c)(3), 15.306(a); *see also ITAC*, 316 F.3d at 1318 (noting that clarifications may be held “with one or more offerors”); *Gulf Group*, 61 Fed. Cl. at 361 (noting the agency’s discretion to request clarifications). GAO decisions consistently support this view. *See, e.g.*, *Priority One Servs., Inc.*, B-288836, B288836.2, 2002 CPD ¶ 79 (Comp. Gen. Dec. 17, 2001) (stating that “clarifications may be requested from just one offeror”) (citations omitted). It was not unreasonable for the Air Force to seek information only from M1 to clarify aspects of M1’s proposal or to correct minor errors in M1’s proposal, if the Air Force planned, based on its evaluation of initial proposals, to award the contract to M1 without seeking revisions of either proposal. The court finds nothing arbitrary or capricious, and no violation of statute or regulation, in the Air Force’s exercise of its discretion to seek clarifications only from M1 in this procurement.

### 5. Did the Difference in Cost Between the Two Proposals Require Discussions to Provide the Best Value to the Government?

Although the Price/Cost factor was less important than the other three evaluation factors for this award, price was nonetheless a substantial factor in the procurement decision. AR at 174. Plaintiff argues that the Air Force could not get the best value in contract services without discussions, "because the proposed alternative approach of entering discussions with both offerors . . . offered the opportunity to save the Government more than $*[]*." Pl.'s Mot. at 29. Here, the difference between the evaluated prices of M1's proposal, $41,827,924, and DI's proposal, $*[]*, is $*[]*, or approximately *[]*% of the awarded contract's price. AR at 806. Both proposal prices were rated fair and reasonable by the Air Force. *Id.*

In a best value procurement, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449 (citations omitted). That discretion necessarily includes the option of selecting a higher-priced proposal over a lower-priced proposal, when the technical aspects of the higher-priced proposal outweigh the difference in price. *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 960 (Fed. Cir. 1993) (stating that "a proposal which is one point better than another but costs millions of dollars more may be selected if the agency can demonstrate within a reasonable certainty that *the added value of the proposal is worth the higher price*") (emphasis in original). GAO decisions upholding the agency's discretion not to engage in discussions in best value procurements have done so even where the protestor's price has been lower than that of the successful offeror. *E.g.*, *HDL Research Lab, Inc.*, B-294959, 2005 CPD ¶ 8; *Century Elevator Inc.*, B-283822, 99-2 CPD ¶ 112.

Applying these principles, the court finds that the award to M1 without discussions was reasonable in the circumstances of this procurement. The decision to award without discussions to M1, despite a price premium of *[]*%, was a reasonable exercise of the Air Force's discretion, in light of the higher technical evaluation of M1's proposal. The higher price of M1's proposal did not make the Air Force's decision to award without discussions arbitrary or capricious, or contrary to statute or regulation.

**B. Were the ENs Sent to M1 Discussions, not Clarifications?**

The Air Force sent three evaluation notices (ENs) to M1 related to Mission Capability, marked MC-1, MC-2, and MC-3. AR at 786-88. The Air Force also

sent three ENs to M1 related to its price proposal, marked P-1, P-2, and P-3. *Id.* at 789-91. All of the ENs were labeled "FAR 15.306(a) Clarifications." *Id.* at 786-91. Plaintiff contends that five of the six ENs constituted discussions, not clarifications. Pl.'s Mot. at 30-32, Pl.'s Reply at 15-20.

As previously stated, clarifications are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated[, in which case] offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." 48 C.F.R. § 15.306(a). Discussions, on the other hand, are "exchanges . . . between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal." *Id.* § 15.306(d). The United States Court of Appeals for the Federal Circuit provided this court with binding interpretations of these two regulatory terms in *ITAC.* 316 F.3d at 1319-23.

First, regarding discussions, the Federal Circuit noted that the "regulation contemplates discussions as occurring in the context of negotiations." *ITAC*, 316 F.3d at 1322 (citing 48 C.F.R. § 15.306(d)). "[W]hen discussions are opened, bidders have the opportunity to revise their proposals, in order 'to maximize the Government's ability to obtain the best value.'" *Id.* (quoting 48 C.F.R. § 15.306(d)(2)). In the context of ENs, when "the government d[oes] not give the [offeror] the opportunity to revise its proposal, and [the offeror] d[oes] not change the terms of its proposal to make it more appealing to the government," the ENs and an offeror's responses to the ENs are not discussions. *Id.* at 1322-23. This standard echoes the long-standing GAO rule that "the acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal." *Priority One Servs., Inc.*, B-288836, B288836.2, 2002 CPD ¶ 79 (citation omitted).

Refuting the argument that ENs that require additional information constitute discussions, not clarifications, the Federal Circuit stated that "[a]ny meaningful clarification would require the provision of information." *ITAC*, 316 F.3d at 1323. If a response to an EN provides information essential to evaluation criteria, increases a past performance score or tips the scales toward the offeror providing the clarification, it still may only be a clarification. *Id.* (citation

omitted). The court counseled against a cramped conception of clarifications. *Id.*

Finally, the Federal Circuit took its analysis of the distinction between clarifications and discussions in FAR 15.306 a step further:

> Even were the regulations not clear [as to the distinction between clarifications and discussions], we give deference to an agency's permissible interpretation of its own regulations. *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 218-19, 121 S. Ct. 1433, 149 L. Ed. 2d 401 (2001); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed. Cir. 2001). The agency designated the ENs as "FAR 13.306(a) clarifications" and included the notice, "[p]lease note that this clarification does not constitute oral discussions with the offeror." EN 0002 (referring to 48 C.F.R. § 15.306(a)). It was a reasonable interpretation of the acquisition regulations to view the ENs as clarifications, and we defer to that interpretation. We recently emphasized that "the [acquisition] regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations." *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002). The appellant here has not shown that the contracting officer misconstrued the regulations or that the procurement was not in accordance with the law.

*ITAC*, 316 F.3d at 1323. Thus, this court must give deference to an agency's "view" that an EN was a clarification, as long as that interpretation was permissible and reasonable. *Id.* As a practical matter, then, following *ITAC* as it must, this court resolves very close questions about an EN in favor of the government, if the EN was intended as a clarification, was labeled as such, did not clearly violate the limitations on clarifications expressed in FAR 15.306(a), and did not clearly stray into the forbidden zone of discussions described in FAR 15.306(d).

**1. MC-1: "Please confirm that the provider stated in the proposal reference will be used to provide aircraft de-paint**

**services."**

Plaintiff does not argue that EN MC-1 exceeds the bounds of a clarification. M1 had selected a corrosion control, or "de-paint," subcontractor, and in its proposal had phrased its selection decision as "[b]ut for now, we have selected Jetstrip, Inc." for this function. AR at 1364. M1's response to EN MC-1simply confirmed this choice, clarifying a minor aspect of its work plan. *Id.* at 655. This is a classic example of a clarification, under FAR 15.306, which did not modify or revise M1's proposal.

**2. MC-2: "Please substantiate the cost avoidance of approximately $*[]* per engine for J-85 parts as stated in Proposal . . . ."**

Plaintiff describes M1's response to EN MC-2 as "supplement[ing] its proposal with a detailed two-page discussion of its process for realizing cost savings for the J-85 engine as well as a chart detailing . . . each of the specific engine parts for which various levels of savings could be achieved." Pl.'s Reply at 15. Plaintiff argues that M1's three page response to EN MC-2 constituted discussions because it "modified the proposal by increasing the proposed savings an additional 20%." *Id.* Plaintiff also complains that these new pages tip M1's proposal over the relevant page limit. *Id.* at 16 n.8.

First, the court notes that requesting additional information does not necessarily exceed the scope of a clarification. *ITAC*, 316 F.3d at 1323. The Air Force wished to clarify the approximately $*[]* in cost savings – M1 supplied the detail of potential savings in a chart, and explained how the savings would accrue to the Air Force. AR at 657-59. As part of the explanation, M1 stated that the amount of cost savings described in its proposal, "approximately $*[]*," was the minimum to be saved, and projected that $*[]* would actually be saved. *Id.* at 658.

The Air Force clearly labeled MC-2 "FAR 15.306(a) Clarifications" and did not seek revisions of M1's cost savings estimate of approximately $*[]* per engine. AR at 787. If, after receipt of the response to EN MC-2, the Air Force had subsequently rated M1's cost savings estimate at $*[]* per engine, rather than at approximately $*[]* per engine, the court would face a close question as to whether M1 had been allowed to revise its proposal. Here, however, M1 was rated on the

$*[]* cost savings estimate. AR at 769, 798. There is no evidence that M1 was allowed to revise its proposed cost savings estimate. Therefore, no discussions were held with M1 through EN MC-2. *See ITAC*, 316 F.3d at 1323 (holding that ENs constitute discussions when the agency gives the offeror an opportunity to revise its proposal, and the offeror does so).

As to the issue of exceeding page limits, plaintiff cites no authority for the proposition that proposal page limits later apply to the total of the original proposal *and* any EN responses submitted at the behest of the agency. The court finds no merit in this argument.

**3. MC-3: "Please provide the percentage reduction in aircraft phase inspection turnaround time that is attributable to proposed processes and procedures stated in Proposal . . . if a *[]* as stated in Proposal . . . is excluded."**

In M1's proposal, M1 included a chart giving its solutions to the challenges of reducing aircraft phase inspection turnaround time, or TAT. AR at 1382. There were nine bulleted items in the column labeled "Solutions," one of which was "Use contractor *[]*." *Id.* M1 predicted that it would achieve a reduction in TAT of *[]*%. *Id.* at 1384. After presenting an extensive review of other measures that would reduce TAT, filling almost four pages, M1 concluded its TAT reduction program description with a short paragraph related to the *[]*:

> *[]*.

*Id.* at 1385. EN MC-3 was directed at determining just how much of the *[]*% reduction in TAT promised by M1 was attributable to the *[]*.

M1 responded to EN MC-3 by stating that the *[]*% reduction in its TAT figure was based on its experience at a base where M1 did not use *[]*, and that therefore none of the *[]*% reduction in TAT was attributable to the *[]*. AR at 660. M1 went on to reiterate its reason for including an *[]* in this proposal, that an *[]* program had improved mission capability by *[]*% at a different base, making the same assertion in its response to EN MC-3 that it had made in its proposal. *Id.* at 660, 1385. M1 concluded that using the two combined approaches might reap TAT reductions of greater than *[]*%. *Id.* at 660 (stating that "[w]ith *[]* . . . , we

would anticipate even greater efficiencies [than the *[]*% reduction prediction]").

Plaintiff argues that EN MC-3 launched discussions between the Air Force and M1 for two reasons. First, plaintiff contends that "M1 took the opportunity to supplement and amend its proposal and provided two pages of further detail regarding how the use of an *[]* could *further* reduce aircraft phase inspection turnaround time [TAT], a concept admittedly not a part of its original proposal." Pl.'s Reply at 16. In other words, plaintiff asserts that because a TAT reduction of greater than *[]*% is more than a TAT reduction of *[]*%, M1's proposal post-EN MC-3 had been revised and was different than M1's pre-EN MC-3 proposal. Second, plaintiff notes that an *[]* was not included in the contract awarded to M1, and surmises that "the Air Force apparently informed the awardee M1 of its concern about *[]* and, in response, M1 agreed to revise its offer to eliminate this *[]* by eliminating the *[]*." *Id.* at 27. This scenario, plaintiff asserts, permitted M1 to correct a defect in its proposal and that correction was the result of discussions, not a clarification. *Id.* at 28. The court addresses plaintiff's arguments in turn.

The Air Force clearly labeled EN MC-3 "FAR 15.306(a) Clarifications" and did not seek revisions of M1's estimate of a *[]*% TAT reduction. AR at 788. As in EN MC-2, the Air Force asked for a breakdown of the components of a particular performance plan. M1's initial proposal, with its estimate of a *[]*% TAT reduction, did not clearly state whether the positive benefits of an *[]* contributed to the *[]*% TAT reduction prediction or not. *See id.* at 1384 (where the *[]*% TAT reduction figure is part of a narrative that does not specify exactly how that figure was derived). The court sees no modification of M1's initial TAT reduction plan in the clarified proposal described in the response to EN MC-3.

The innovation of *[]* contributed, at least in part, to two strengths assigned to M1's proposal by the evaluation team. First, the *[]* was the sole reason for a strength in the Management and Integration subpart of the Program Management subfactor of Mission Capability, which listed the multiple benefits of having *[]*. AR at 767. Another strength was awarded in the TAT subpart of the Operations and Maintenance subfactor of Mission Capability, in part for the *[]* contributions to reducing TAT. *Id.* at 771.

These evaluated strengths were based on M1's initial proposal. Thereafter, the EN responses were received by the Air Force. *Id.* at 652. The SSDD found the

same strengths, based on M1's initial proposal, and makes no mention of a possible increase in efficiencies beyond *[]*%. *Id.* at 797, 801-02.

Even if M1 had attempted to revise its proposal to reflect greater TAT reductions, which the court concludes it did not, the Air Force continued to evaluate M1's unrevised initial proposal for TAT reduction. There is no evidence that M1 was allowed to revise its proposed TAT reduction estimate. Therefore, no discussions were held with M1 through EN MC-3. *See ITAC*, 316 F.3d at 1323 (holding that ENs constitute discussions when the agency gives the offeror an opportunity to revise its proposal, and the offeror does so).

Plaintiff's second argument fails for the simple reason that there is no evidence in the record that M1 revised its proposal to eliminate the *[]*. Rather, the record clearly indicates that the Air Force was concerned about *[]* issues and was not certain to incorporate M1's innovation into the contract. AR at 767 ("This *[]* strength may be incorporated into the contract pending complete consideration of government *[]* issues and the government's review of the contractor's *[]* after contract award."). The awarded contract's list of incorporated innovations did not include the *[]*. *Id.* at 1135-37. Without more, the court has no reason to believe that it was M1, rather than the Air Force, that made the decision not to include an *[]* in the contract at the time of award. There is no evidence that M1 was allowed to modify its proposal to eliminate the *[]*, and thus there is no evidence that discussions took place on this issue.

**4. P-1: "For Cost-Reimbursable Contract Line Item Numbers (CLINs), proposed handling rates are not applied to the listed Not-to-Exceed amounts to arrive at total extended amounts. Please submit a correction of this error."**

Price proposals were to include a number of Cost-Reimbursable Contract Line Item Numbers (CLINs), some of which were "denoted as 'Not-to-Exceed (NTE)'" CLINs. AR at 161. For each NTE CLIN, the offeror was required to state the NTE amount for that CLIN, its handling rate for that CLIN stated as a percentage, and then a grand total for that CLIN, derived from the stated NTE amount plus the handling charge (stated NTE amount multiplied by the stated handling rate). *Id.* This grand total was called the "total extended amount." *Id.*

M1 neglected to report the total extended amount for its NTE CLINs. AR at 1448-1503. Although the figures upon which the total extended amount could be derived were reported for each CLIN, M1 reported a "net amount" based solely on the stated NTE amount, rather than on the total extended amount, and thus under-reported the cost for each of these CLINs. *Id.* This under-reporting carried through to the summary page of M1's price proposal. *Id.* at 1506.

The Air Force requested that M1 correct this error in EN P-1. Plaintiff argues that this correction "allowed M1 to adjust its total evaluated price to include [its handling] rate." Pl.'s Mot. at 32. Plaintiff asserts that this correction was a revision of M1's price proposal, and thus that EN P-1 initiated discussions between M1 and the Air Force. Pl.'s Reply at 15-16.

The correction of minor or clerical errors is an approved purpose of clarifications. 48 C.F.R. § 15.306(a)(2) (stating that clarifications "give[] the opportunity to . . . resolve minor or clerical errors"). Mathematical errors fit within the type of errors which can be corrected through clarifications. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1333 (Fed. Cir. 2004) (finding that a "correction of an obvious mathematical error . . . would fall squarely within the definition of 'clarification' rather than 'discussion'"); *Int'l Res. Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 162 (2005) (ruling that the government's inquiry into an apparently erroneous figure in the successful offeror's proposal was "a quintessential example of a clarification") (citations omitted). Logically, a mathematical clarification which causes the successful offeror's price to go up, and thus makes the offer less attractive to the government, is less likely to be found improper. *See Galen*, 369 F.3d at 1333 (noting that a contracting officer's action had "moreover, actually increased [the successful offeror's] bid price," and concluding that the change to the bid price was not the result of an improper discussion); *IPlus, Inc.*, B-298020, B-298020.2, 2006 CPD ¶ 90 (Comp. Gen. June 5, 2006) (noting that when "the exchange resulted in the agency confirming a higher price for [the successful offeror] under [a] fixed-price contract[,] . . . this exchange did not constitute discussions, but rather was a clarification of an obvious error").

Here, the correction requested by the Air Force was minor, and resulted in an increase to M1's bid price of $*[]*, an increase of *[]* percent. AR at 776, 1506. Moreover, the Air Force had already calculated the increase in price and evaluated

M1's bid price with the corrected figures, because of the obvious math error, before sending EN P-1 to M1. *Id.* at 776. All of the information needed to correct the CLIN amounts was present in M1's proposal. There was thus no post-EN revision to M1's evaluated bid price. This type of minor mathematical correction, where the government already has the information it needs in order to make an evaluation of a bidder's price, is a clarification, not a discussion. *IPlus, Inc.*, B-298020, B-298020.2, 2006 CPD ¶ 90 ("An agency may allow an offeror to correct a clerical error in a cost or price proposal through clarifications, as opposed to discussions, where the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal.") (citation omitted).

**5. P-2: "Please provide documentation of a Defense Contract Management Agency (DCMA)-approved purchasing system."**

Offerors were required to submit detailed price/cost proposals, which would be subjected to price analysis as defined by FAR 15.404-1(b). AR at 178 (citing 48 C.F.R. § 15.404-1(b)). The price/cost proposals were evaluated by comparing an offeror's proposed CLIN prices with other offerors' prices, with prices the government had experienced on other contracts, and with the government's cost estimates, and by comparing the offerors' handling rates. *Id.* at 178-79, 805. In addition to the price/cost information which would form the basis of the price/cost evaluation, offerors were instructed by Section L-10.3 of the solicitation to submit "Information Other Than Cost or Pricing Data." *Id.* at 161.

Section L-10.3 of the solicitation asked for information related to the financial condition of the offeror, as well as audit history, compliance with accounting standards, and contact information for oversight authorities. AR at 161. One request in Section L-10.3 was phrased "[a]dditionally, provide documentation of a Defense Contract Management Agency (DCMA)-approved purchasing system which is in compliance with your disclosure statement." *Id.* The sentence immediately before this request asked for "identification of compliance with Cost Accounting Standards (CAS), if applicable." *Id.*

In response to this instruction, M1 submitted a narrative stating that M1 was not required to "operate a Government approved accounting system," because of its small business status. AR at 1749. Nevertheless, M1 reported that it operated a

CAS-compliant accounting system and had no CAS violations. *Id.* M1 neglected to attach any documentation regarding a DCMA-approved purchasing system. The Air Force, in EN P-2, requested that documentation.

In its response to EN P-2, M1 reported that it did not have documentation of a DCMA-approved purchasing system, because its contracting thus far had not required that approval. AR at 697. M1 went on to describe its purchasing experience, its voluntary compliance with various accounting standards and its close relationships with a business mentor and a subcontractor, entities with DCMA-approved purchasing systems. *Id.* at 697-98. M1 also stated that it planned to obtain DCMA approval for its purchasing system in 2007. *Id.* at 698.

Plaintiff argues that allowing M1 to explain the lack of documentation of a DCMA-approved purchasing system in its proposal "afforded [M1] the *opportunity* to amend its proposal to correct this material omission in its initial submission." Pl.'s Reply at 17 (emphasis in original). Plaintiff goes on to review M1's response to EN P-2, wherein M1 explained why it had not included documentation of a DCMA-approved purchasing system in its proposal, and concludes that discussions occurred. *Id.* at 15, 18. The court disagrees.

All of the instructions in Section L-10.3 of the solicitation refer to proof of financial and fiscal responsibility. These items were required to determine M1's responsibility, not to evaluate its responsiveness to the solicitation. *See* 48 C.F.R. § 9.104-1 (2006) (defining the criteria used to determine whether prospective contractors are responsible). The review of M1's fiscal systems is found in a document titled "Determination of Contractor Responsibility for Contract Award," wherein the Air Force found that M1's accounting capacity was adequate and accepted M1's explanation that "it is a small business and as such is not required to operate a government-approved accounting system." AR at 809, 813. This is a statement extracted from M1's initial proposal, *id.* at 1749, and no mention is made of the supplemental information M1 provided in response to EN P-2.

Thus, the Air Force relied on M1's initial proposal to conclude that its fiscal systems, although lacking a DCMA-approved purchasing system, were adequate. M1's response to EN P-2 gave other reasons why M1 could ably perform the purchasing required for the contract, but there is nothing in the record to suggest that this supplemental information affected the determination of M1's

responsibility. Plaintiff has not pointed to any provision, either in the FAR or the solicitation itself, that would indicate that a small business such as M1 was not excused from having a DCMA-approved purchasing system. Thus, the court accepts the version of events established by the administrative record, wherein the Air Force relied on M1's initial proposal to excuse M1's omission of documentation concerning DCMA approval of its purchasing system.

Even if the Air Force had relied on M1's response to EN P-2 for its responsibility determination, the GAO has frequently held that exchanges addressing the responsibility of a contractor do not constitute discussions. *See, e.g., Gen. Dynamics-Ordinance & Tactical Sys.*, B-295987, B-295987.2, 2005 CPD ¶ 114 (Comp. Gen. May 20, 2005) ("A request for, or providing of, information that relates to offeror responsibility, rather than proposal evaluation, does not constitute discussions and thus does not trigger the requirement to hold discussions with other competitive range offerors.") (citation omitted); *A.B. Dick Co.*, B-233142, 89-1 CPD ¶ 106 (Comp. Gen. Jan. 31, 1989) (stating that "we have held that information that relates to responsibility or the correction of a clerical error does not constitute improper discussions or require that revised proposals be solicited from all offerors") (citation omitted). This court has approvingly cited GAO cases stating this rule to support a holding that exchanges concerning an element of responsibility such as a subcontractor plan do not constitute discussions. *See Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 627 (2005) (citing *Kahn Instruments, Inc.*, B-277973, 98-1 CPD ¶ 11 (Comp. Gen. Dec. 15, 1997); *A.B. Dick Co.*, B-233142, 89-1 CPD ¶ 106). The court applies this reasoning and holds that the exchanges between M1 and the Air Force regarding M1's purchasing system, even if they had produced changes in M1's proposal, could not have constituted discussions under FAR 15.306(d) because these exchanges only concerned M1's responsibility.

**6. P-3: "Please provide the most recent financial statements that are available."**

Section L-10.3 of the solicitation instructed offerors to "[i]nclude the most recent financial statements that are available." AR at 161. M1 neglected to do so. In EN P-3, the Air Force asked M1 to correct this oversight, and M1 responded by attaching recent financial statements. *Id.* at 706-08.

This information was not evaluated as part of the Air Force's price/cost analysis, and simply provided data for the responsibility determination concerning M1, the apparently successful offeror. *See* AR at 811 (noting that M1 "submitted recent financial statements" which were analyzed and judged adequate). As discussed *supra*, exchanges regarding offeror responsibility do not constitute discussions. *E.g.*, *Ask Mr. Foster Travel Div.*, B-238305, 90-1 CPD ¶ 460 (Comp. Gen. May 9, 1990) (citation omitted). For this reason, no discussions occurred with M1 through EN P-3.

**C. Was M1's Proposal Non-Responsive to the Solicitation?**

Plaintiff argues that M1 was ineligible to receive the contract award because its proposal did not include documentation concerning a DCMA-approved purchasing system, and because M1 does not have a DCMA-approved purchasing system, as required. Pl.'s Mot. at 33-34. For this reason, plaintiff asserts that M1's proposal "was and is non-compliant" with "a material requirement of the Solicitation." *Id.* at 33. The court has already discussed whether the EN sent to M1 regarding a DCMA-approved purchasing system was a clarification or a discussion. *See supra* Analysis Section III(B)(5). Here, the question is whether M1's proposal was responsive despite its omission of "documentation of a Defense Contract Management Agency (DCMA)-approved purchasing system which is in compliance with your disclosure statement." AR at 161.

As the court has previously noted, the instruction concerning documentation of an approved purchasing system was found in Section L-10.3 of the solicitation, a section which required bidders to submit information related to their responsibility. *See* AR at 161. This court is not unmindful of the distinction between items required to render a proposal responsive to a solicitation, and items required for the determination of an apparently successful offeror's responsibility. *See VMS Hotel Partners v. United States*, 30 Fed. Cl. 512, 514-15 (1994) ("Unlike with 'responsiveness,' in assessing the contractor's 'responsibility,' the contracting officer is not limited to the information contained in the bid when opened."); *Heli-Jet Corp. v. United States*, 2 Cl. Ct. 613, 620 (1983) (approving of GAO decisions defining responsiveness items as "information affecting the legal obligation of the contractor to perform the contract and provide the goods or services called for" and defining responsibility items to be "[c]ollateral data, such as information regarding a bidder's ability") (citations omitted). One important

distinction between responsiveness and responsibility is that

> [m]atters of bid responsiveness must be discerned solely by reference to the materials submitted with the bid and facts available to the government at the time of bid opening. However, responsibility determinations are made at the time of award. A bidder may present evidence subsequent to bid opening but prior to award to demonstrate the bidder's responsibility.

*Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226-27 (1990) (citation omitted).

Because the solicitation instruction concerning documentation of a DCMA-approved purchasing system relates to a responsibility issue, M1's proposal omission has no impact on the responsiveness of M1's proposal. If plaintiff were challenging, instead, the responsibility determination of the Air Force regarding M1, plaintiff would face a similarly deferential standard of review. "Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination. But this discretion is not absolute." *Impresa*, 238 F.3d at 1334-35 (quoting *John C. Grimberg*, 185 F.3d at 1303). Here, however, plaintiff has not advanced that argument, and the court sees no flaw in the Air Force's determination that M1 was a responsible offeror.

### D. Was the Contract Illegally Modified after Award?

Finally, plaintiff argues that M1 was inappropriately allowed to revise its proposal to eliminate its *[]*. Pl.'s Reply at 26-27. The *[]* was a positive aspect of M1's proposal mentioned by both the evaluation team and the SSA. AR at 767, 771, 797, 801. The *[]* described in M1's proposal was not incorporated into the awarded contract. *Id.* at 1135-37; Pl.'s Reply at 26; Def.'s Reply at 18. According to plaintiff, this change in M1's proposed service design constituted unlawful discussions, caused "the procurement decision [to be] rendered illusory," and revealed a fundamental flaw in the source selection decision. Pl.'s Reply at 27-28. The topic of the allegedly unlawful discussions regarding the *[]* has been fully reviewed *supra* in Analysis Section III(B)(3). The court now turns to plaintiff's other arguments regarding the exclusion of the *[]* from the contract.

The record clearly indicates that the Air Force was concerned about *[]* issues and was not certain to incorporate M1's innovation into the contract. AR at 767 ("This *[]* strength may be incorporated into the contract pending complete consideration of government *[]* issues and the government's review of the contractor's *[]* after contract award."). In the end, the Air Force chose not to incorporate the *[]* innovation in the awarded contract, at least at the time of award. *Id.* at 1135-37 (showing that other innovations had been added to the contract, but not the *[]*). The solicitation clearly stated that

> [a]ny features or technical offerings that exceed requirements contained in the [Performance Work Statement] PWS and are determined to provide added value to the Government may be considered under a best value determination. . . . Offerors are advised that any features or technical offerings that exceed PWS requirements *and are accepted* by the Government *may* be incorporated as a requirement in the resultant contract.

*Id.* at 174 (emphasis added). The award of the contract conforms to the terms of the solicitation and plaintiff's argument that the procurement decision was illusory fails for this reason.

Plaintiff's remaining argument is that the *[]* concern related to the *[]* appears not to have been disclosed to the SSA, and this failure to provide accurate information to the SSA requires this court to set aside the procurement. Pl.'s Reply at 28. Plaintiff's argument is not founded in fact – the *[]* concern related to the *[]*, and the possibility that the Air Force might not incorporate the *[]* into the contract was disclosed to the SSA. *See* AR at 767. This argument, too, must fail.

**CONCLUSION**

DI has not met its burden to show that the contract award to M1 was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote*, 365 F.3d at 1350 (citation omitted). For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Plaintiff's Motion for Judgment on the Administrative Record,

including all of its subsumed requests for injunctive and declaratory relief, filed February 20, 2007, is **DENIED**. The Cross-Motions for Judgment on the Administrative Record, filed by defendant and intervenor-defendant on February 26, 2007, are **GRANTED**;

(2) The Clerk's Office is directed to **ENTER** final judgment **DISMISSING** the complaint with prejudice in this action;

(3) On or before **April 20, 2007**,[5] counsel for each party shall file with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(4) Each party shall bear its own costs.

/s/ Lynn J. Bush
LYNN J. BUSH
Judge

[5]/ Later extended to May 18, 2007, at the request of the parties.